# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES *v.* SULLIVAN ASSOCIATES

# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES *v.* SULLIVAN ASSOCIATES
## (SC 16042)[†]

Callahan, C. J., and Norcott, Palmer, McDonald and Peters, Js.[*]

---

† Reargument denied. *Commission on Human Rights & Opportunities* v. *Sullivan Associates,* 251 Conn. 924, 742 A.2d 364 (1999).

[*] This listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued June 1—officially released October 12, 1999

*Raymond P. Pech,* with whom were *Philip A. Murphy, Jr.,* and *David S. Stowe,* for the appellant (CHRO in each case).

*James H. Lee,* for the appellee (defendant in each case).

*Nancy J. Downing* filed a brief for the Connecticut Fair Housing Center, Inc., et al. as amici curiae.

*Opinion*

PETERS, J. Under General Statutes § 46a-64c,[1] a landlord may not refuse to rent to a prospective low income

---

[1] The plaintiff's petitions are based on General Statutes § 46a-64c (a) (1) and (2), which provide: "(a) It shall be a discriminatory practice in violation of this section:

"(1) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, creed, color, national origin, ancestry, sex, marital status, age, lawful source of income or familial status.

"(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities

tenant because that tenant will pay the stipulated rent from a lawful source of income, such as rental assistance under section 8 of the housing assistance program administered by the Department of Housing and Urban Development pursuant to section 8 of the National Housing Act, as amended in 1974 and codified at 42 U.S.C. § 1437f (section 8).[2] There is no dispute that, unlike the federal rules regulating the section 8 program, state law makes mandatory landlord participation in the program as administered by state agencies. The principal issues in this case are whether a landlord may avoid renting to otherwise qualified section 8 tenants by requiring the use of a standard lease that deviates from section 8 lease specifications or by insisting on tenant income requirements beyond those contemplated by the state statute. We conclude that, in enacting the antidiscrimination mandate of § 46a-64c, the legislature did not intend to permit such deviations from the statutory scheme.

Patricia Hanson and Patricia Roper (the relators) filed separate complaints with the plaintiff in each case, the commission on human rights and opportunities (commission), alleging that the defendant in each case, Sullivan Associates, had violated § 46a-64c by refusing rentals to the relators because they expected to pay for their housing using their lawful source of income, namely, housing assistance from the state section 8 program. The commission filed petitions in the Housing Session of the Superior Court on behalf of the relators.[3] The defendant, denying that it had discriminated against the relators, alleged that its refusal to rent was based on its uniform policy of insisting on the terms of its

in connection therewith, because of race, creed, color, national origin, ancestry, sex, marital status, age, lawful source of income or familial status. . . ."

[2] The section 8 program provides rental subsidies for low income persons.

[3] The filing of the complaints followed a determination of reasonable cause on the complaints and the defendant's election to proceed by civil action. The petitions of the two relators subsequently were consolidated.

own standard lease and its own standard income requirements. In addition, by way of special defense, the defendant raised constitutional objections to § 46a-64c if it were applied as construed by the commission.[4]

The trial court, *Cocco, J.*, concluded that the defendant had not violated the statute and, accordingly, rendered judgments on its behalf.[5] The commission appealed from the judgments of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c). We reverse the judgments of the trial court.

I

FACTUAL BACKGROUND

The parties stipulated to the following facts at trial. The commission is a state agency charged with the enforcement of a number of antidiscrimination statutes including § 46a-64c. The defendant was, at the time of the incidents that gave rise to this action, a general partnership that owned four residential rental properties in the city of Bridgeport, three single-family houses and one three-family house.

The defendant followed a standardized policy in renting its properties. Once a vacancy had been advertised, the defendant's employees[6] responded to telephone inquiries by asking callers to identify themselves, their

---

[4] The parties agreed to bifurcate the trial into liability and damages stages.

[5] The trial court did not reach the defendant's constitutional arguments that requiring compliance with § 46a-64c would impose "significant burdens" on the defendant and would violate the supremacy clause and the fourteenth amendment of the United States constitution and article first, § 11, of the Connecticut constitution. The defendant has not renewed its constitutional arguments in this court, with the exception of a preemption argument, which it offers as an alternative ground for affirmance.

[6] All inquiries were answered by the defendant's managing partner, Robert Sullivan, or his secretary, Jane Swetckie.

coresidents and their gross household income.[7] Only if the caller's answers were deemed satisfactory, and the caller agreed to pay both the first month's rent and a security deposit of two additional months' rent would the potential rental property be identified specifically and shown to the caller. If the defendant and the prospective tenant agreed to the rental, the defendant required the tenant to sign its own standard form lease. The defendant had kept rental units vacant for as long as six months rather than rent those units to persons it considered unqualified. The defendant never has rented any of its properties to any recipient of section 8 assistance, because prospective tenants receiving section 8 assistance consistently have been excluded from consideration in the initial telephone screening process.

On March 2, 1994, the defendant advertised the rental of a house on Lindley Street in Bridgeport. That same day, Hanson,[8] a single parent of two minor children residing in Bridgeport, inquired about the rental but was turned away when she identified herself as a person whose income was derived from section 8 assistance and the federal aid to families with dependent children program (AFDC). 42 U.S.C. § 601 et seq.[9] She was told

---

[7] The defendant required prospective tenants to have a gross weekly income that was "close to or [exceeded] one month's rent." If a person's income was close to the minimum required by the defendant, the defendant would permit that person to proceed with a lease guarantor whose income met the guideline. The defendant also required a verification of income, references from former landlords and a credit check.

[8] Hanson called in response to an advertisement for "BRIDGEPORT Lindley St. 3 BR HOUSE New Paint & Carpets. $750/Mo. 366-2564."

[9] At the time, Hanson's monthly gross income was $1361, consisting of $602 in section 8 rental assistance, $581 from AFDC, and $178 in food stamps. Had Hanson been accepted as a tenant for the house at Lindley Street, her monthly section 8 rental assistance would have been increased to $739. Under the section 8 program, Hanson would have been responsible for paying the defendant $11 of the $750 rent each month. The remaining $739 would have been paid directly to the defendant by the local housing authority, under a separate contract.

that "the landlord did not qualify for section 8 because the landlord required two months' rent as security and section 8 would not allow two months' security as the landlord understood the program." Shortly thereafter, an employee of a local fair housing office, posing as a prospective tenant relying on section 8 rental assistance, received a similar reply.[10] One month later, Roper, a single parent of three children, inquired about renting the same property.[11] When she disclosed that she had no income other than section 8 housing assistance,[12] she was informed that she would need an annual income of $38,000 in order to qualify to rent the house.[13]

On June 6, 1994, the defendant ran another newspaper advertisement offering to rent the same house in Bridgeport. That day, Roper again called the defendant. Although she stated that she had a section 8 certificate sufficient to pay the rent, she again was informed that her income did not meet the defendant's $38,000 minimum income requirement. On that occasion, Roper also was told that the defendant's policy of requiring two months rent as security made the defendant ineligible to participate in the section 8 housing program.

[10] Another fair housing officer, who represented that she was employed and interested in renting the property, was given a description of the premises and its exact address.

[11] In April, 1994, Roper's monthly gross income was $1533, consisting of $631 in section 8 rental assistance, $776 in Social Security disability benefits, and $126 in food stamps. Had the defendant accepted Roper as a tenant, her monthly section 8 rental assistance subsidy would have been increased to $686. Under the section 8 program, Roper would have been responsible each month for paying $64 of the rent to the defendant. The remainder would have been paid to the defendant directly by the local housing authority, under a separate contract.

[12] In fact, Roper also received Social Security benefits and food stamps.

[13] The defendant rented the house on May 17, 1994, to an individual whose income did not include section 8 assistance. Although the new tenant's income of $555 per week did not meet the defendant's minimum income standard, the defendant permitted her to rent the unit with her mother as a lease guarantor. The combined income of that tenant and her mother exceeded the defendant's minimum income standard.

Both relators filed complaints with the commission alleging that the defendant's refusal to rent to them because of their reliance on financial assistance from the section 8 program violated the antidiscrimination provisions of § 46a-64c.[14] The commission then brought the present actions on their behalf. The trial court rendered its judgments in favor of the defendant on the ground that the statute permitted the defendant to decline to rent to the relators as long as the defendant consistently conducted its rental business by use of its standard rental agreement and income requirements.

On appeal, the commission contends that the trial court improperly construed § 46a-64c with respect to: (1) the statutory requirement of mandatory section 8 lease terms; and (2) the income requirements of potential section 8 tenants. The defendant urges us to affirm the judgments, either as articulated by the trial court or on the alternate ground that a state statute mandating acceptance of tenants with section 8 income is preempted by federal law. We agree with the commission, and, accordingly, reverse the judgments of the trial court.

II

THE SECTION 8 PROGRAM

Analysis of the claims of the parties requires an understanding of the section 8 housing program as it is administered in this state. The section 8 program exists "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing . . . ." 42 U.S.C. § 1437f (a) (1994). Section 8 is a cooperative venture between the federal Department of Housing and Urban Development (HUD)

---

[14] There is no claim in this case of discrimination on any ground other than section 8 housing assistance.

and state and local public housing agencies, which oversee the day-to-day operations of the program.[15] While state and local housing agencies contract with landlords who own dwelling units to make assistance payments, HUD enters into annual contribution contracts with the agencies. 42 U.S.C. § 1437f (b) (1) (1994).

Although it is the local public housing authorities that actually run the section 8 program, they must do so in accordance with applicable federal regulations. See 24 C.F.R. § 882.101 (1994) (applicability and scope of section 8 regulations). The section 8 program in Connecticut also must comply with state law, including the antidiscrimination provisions of § 46a-64c.

Section 8 rental assistance is available only to persons who are classified as very low income or as low income within the meaning of 24 C.F.R. §§ 813.102 and 813.105 (1994).[16] The program permits otherwise qualified tenants to rent private units[17] and to pay personally only a small portion of the total rent, commensurate with their income.[18] The local public housing authority contracts separately with the landlord to pay the remainder

[15] A public housing agency is defined as "[a]ny State, county, municipality or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of housing for low-income Families.") 24 C.F.R. § 882.102 (1994).

[16] A low income family is one whose annual income is no more than 80 percent of the median income for the area (adjusted for the size of the family); a very low income family has an annual income of no more than 50 percent of the median income for the area. 24 C.F.R. § 813.102 (1994). Very low income tenants generally are given significant preference over those who are classified as only low income tenants. See, e.g., 24 C.F.R. § 813.105 (1994).

[17] Section 8 housing assistance typically may be used only for units that rent for no more than 10 percent above the "fair market rental." 42 U.S.C. § 1437f (c) (1) (1994); 24 C.F.R. § 882.106 (1994). Fair market rentals are calculated using several criteria, but generally are based on the forty-fifth percentile rent of standard quality rental housing in a particular metropolitan or nonmetropolitan area. 24 C.F.R. § 888.113 (1994).

[18] The rent payable by the tenant personally is the greater of either 10 percent of the tenant's monthly income, or 30 percent of the tenant's monthly adjusted income. 42 U.S.C. § 1437a (a) (1) (1994). Adjusted income is defined

of the rent directly to the landlord. 24 C.F.R. § 882.105 (1994).

In 1994, federal regulations required a prospective tenant and landlord to use a standardized lease and addendum in order to participate in the section 8 program.[19] 24 C.F.R. § 882.209 (j) (1) (1994). In the present case, the defendant has raised objections to the terms in the standardized section 8 lease provisions that regulate lease termination by the landlord[20] and prescribe maximum allowable security deposits.[21] The maximum security deposit authorized by state law; see General Statutes § 47a-21 (b); is the same as that authorized by federal law.

## III

## PREEMPTION

We consider first the defendant's claim of federal preemption because, if that claim were correct, it would

as gross income with deductions for dependent children, elderly and disabled family members, large medical expenses, childcare and other costs. 42 U.S.C. § 1437a (b) (5) (1994).

[19] The current federal regulations do not contain this mandate. See 24 C.F.R. § 982.308 (1998) (local housing authorities may not require use of standardized lease, but any lease entered into must conform to certain standards).

[20] The section 8 lease provides that a landlord may terminate the lease only for the following reasons: (1) serious or repeated violation of lease terms; (2) violation of federal, state, or local law; or (3) other good cause. Examples provided of other good cause reasons include: legitimate business decisions, such as the decision to rent the unit at a higher rental price or to sell the property; the landlord's private decisions, such as conversion of the rental unit to personal or family use; conduct by the tenant resulting in the disturbance of the neighbors; conduct by the tenant damaging the unit or surrounding property; criminal activity on the rented premises that involves physical violence; and refusal by the tenant to accept a new lease when offered by the landlord. 24 C.F.R. § 882.215 (c) (iii) (2) (1994).

[21] Section 8 lease provisions permit the owner to demand from the tenant as a security deposit only a sum that is no greater than the tenant's portion of the rent or $50. 24 C.F.R. § 882.112 (a) (1994). Should the landlord deem such a security deposit to be insufficient, however, the landlord may demand reimbursement from the public housing authority for up to two months of

make further consideration of the other statutory issues raised in connection with § 46a-64c superfluous. The defendant maintains that, if § 46a-64c requires landlords to accept tenants whose income includes section 8 assistance, then its provisions are preempted by the federal section 8 statute itself; 42 U.S.C. § 1437f; which makes participation in the program voluntary.[22] The trial court concluded that nothing in the federal program prevents a state from mandating participation. We agree with the trial court.

"The question of preemption is one of federal law, arising under the supremacy clause of the United States constitution. . . . Determining whether Congress has exercised its power to preempt state law is a question of legislative intent. . . . Preemption may be express or implied. . . . Express preemption occurs to the extent that a federal statute expressly directs that state law be ousted to some degree from a certain field. . . . Even where there is no express statutory statement ousting state law from a given area, [however] there may be implied preemption. . . . The United States Supreme Court has instructed us that, absent an explicit statement that Congress intends to preempt state law, courts should infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law . . . or where the state law at issue conflicts with federal law, either because it is impossible to comply with both . . . or because the state law

the rent to cover unpaid rent or damage to the unit that exceeds the amount of the security deposit. 24 C.F.R. § 882.112 (d) (1994).

[22] It should be noted that there is no express language in 42 U.S.C. § 1437f to the effect that landlord participation in section 8 programs is voluntary. The courts that have found it to be voluntary have done so mainly because 42 U.S.C. § 1437f (d) (1) (A), along with the applicable regulations, gives landlords the authority to select tenants. See *Salute* v. *Stratford Greens Garden Apartments*, 136 F.3d 293, 296 (2d Cir. 1998); *Knapp* v. *Eagle Property Management Corp.*, 54 F.3d 1272, 1280 (7th Cir. 1995).

stands as an obstacle to the accomplishment and execution of congressional objectives . . . ." (Citations omitted; internal quotation marks omitted.) *Dowling* v. *Slotnik*, 244 Conn. 781, 791, 712 A.2d 396, *cert. denied*, 525 U.S. 1017, 119 S. Ct. 542, 142 L. Ed. 2d 451 (1998).

Each of these considerations leads us to conclude that federal law does not preempt the mandate of § 46a-64c requiring landlords to rent to otherwise qualified tenants whose income includes section 8 funding. On its face, 42 U.S.C. § 1437f contains no express preemption clause. Furthermore, the federal statute does not "occupy the field" so comprehensively that states implicitly are prohibited from acting in the arena of low income housing assistance. Indeed, 42 U.S.C. § 1437f explicitly contemplates state and local participation in the section 8 program. See, e.g., 42 U.S.C. § 1437f (b) (authorizing secretary of HUD to enter into contracts with local public housing authorities); 42 U.S.C. § 1437f (d) (authorizing local public housing authorities to enter into housing payments contracts with landlords).

We deem it to be especially significant that a mandatory state program for low income housing does not conflict with the purposes and objectives of 42 U.S.C. § 1437f. The federal statute was enacted "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing . . . ." 42 U.S.C. § 1437f (a); see also 42 U.S.C. § 1437 (declaration of policy). Requiring landlords to extend rental opportunities to otherwise eligible section 8 recipients, in accordance with the terms of section 8 leases, is not an obstacle to the congressional agenda but serves instead to advance its remedial purpose. Finally, it is not impossible for landlords to obey both 42 U.S.C. § 1437f and § 46a-64c, because nothing in the text of 42 U.S.C. § 1437f requires participation to be voluntary.

Our preemption analysis is consistent with the decisions of the majority of courts in other jurisdictions that have considered the issue. See *Franklin Tower One, LLC* v. *N.M.*, 157 N.J. 602, 622, 725 A.2d 1104 (1999) (federal statute does not preempt state law requiring landlords to accept tenants with section 8 assistance); *Attorney General* v. *Brown*, 400 Mass. 826, 831, 511 N.E.2d 1103 (1987) (same); see also *Stevenson* v. *San Francisco Housing Authority*, 24 Cal. App. 4th 269, 280–81, 29 Cal. Rptr. 2d 398 (1994) (federal section 8 provisions do not preempt state law immunity of local government entities). The one court that did suggest preemption did so only in dictum. See *Knapp* v. *Eagle Property Management Corp.*, 54 F.3d 1272, 1282 (7th Cir. 1995) ("[i]t seems questionable, however, to allow a state to make a voluntary federal program mandatory").

For all these reasons, the defendant's claim of federal preemption cannot be sustained. The Connecticut legislature had the authority to enact a mandatory section 8 housing program in this state. In 1989, the legislature amended Connecticut's public accommodations law; General Statutes § 46a-63 and 46a-64; to prohibit discrimination in housing on the basis of a tenant's lawful source of income, including housing assistance. Public Acts 1989, No. 89-288. In 1990, the prohibition on housing discrimination on the basis of lawful source of income was moved to what became § 46a-64c. Public Acts 1990, No. 90-246. Unlike the federal provisions governing section 8, the provisions of § 46a-64c, which require landlords to accept otherwise qualified tenants whose lawful source of income may include section 8 housing assistance, are mandatory. Pursuant to this statute, it is a part of the public policy of this state that landlords may not discriminate against housing applicants because such applicants, otherwise qualified as potential tenants, look to section 8 assistance for payment of the stipulated rent.

## IV

## LEASE TERMS REQUIRED BY § 46a-64c

Although the trial court recognized that § 46a-64c made landlord participation in "housing assistance" programs mandatory, the court concluded that the statute did not require landlords to agree to the terms of section 8 leases. Construction of a statute raises an issue of law in which our review of the trial court's conclusion is plenary. The commission argues that the court misconstrued the statute. We agree with the commission.

Section 46a-64c (a) (1) forbids landlords from refusing "to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, creed, color, national origin, ancestry, sex, marital status, age, *lawful source of income* or familial status." (Emphasis added.) Section 46a-64c (a) (2) forbids discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, creed, color, national origin, ancestry, sex, marital status, age, *lawful source of income* or familial status." (Emphasis added.) General Statutes § 46a-63 (3) provides, in addition, that " 'lawful source of income' means income derived from social security, supplemental security income, *housing assistance*, child support, alimony or public or general assistance." (Emphasis added.)

Three preliminary observations inform our construction of these provisions. First, as the trial court concluded, the lawful sources of income protected from discrimination by § 46a-64c include "section 8 rental subsidies as a form of housing assistance." Second, compliance with section 8 requirements for the use of a section 8 lease for those eligible for section 8 assistance

does not require a landlord to forbear from insisting on adequate security for its lease, including a two months' rental security deposit, and on reasonable provisions for its termination, including nonpayment of rent and changes in the economic use of the property.[23] Third, nothing in the statutes forbidding discrimination against tenants receiving section 8 rental subsidies requires landlords to accept tenants who may be unqualified to rent for nondiscriminatory reasons such as, for example, a poor rental history, poor references, or poor credit.[24] The target of the statutes is, instead, the unspoken presumption that section 8 assistance recipients, by virtue only of their source of income, are undesirable tenants for a landlord's rental properties.

The question before us in the present case is whether § 46a-64c, while prohibiting landlords from discriminating on the basis of source of income, was intended to excuse landlords from participation in section 8 programs if they did not wish to accept the terms of section 8 leases. It is crucial to our consideration that, under the applicable federal regulations, at the relevant time, federal section 8 reimbursement *required* the use of standardized section 8 leases for all section 8 participants. 24 C.F.R. § 882.209 (j) (1) (1994). A landlord's refusal to substitute such a lease for its own, therefore, operated as a blanket rejection of all prospective tenants whose income included section 8 assistance. We must decide whether that result is what the legislature contemplated in enacting this antidiscrimination statute.

Our determination of the scope of § 46a-64c calls upon us to construe its terms in accordance with well

---

[23] Section 8 regulations, described in footnote 20 of this opinion, permit a landlord to terminate a section 8 lease for a broad range of reasons, both general and specified.

[24] The legislative history of § 46a-64c so demonstrates. See remarks of Representative Lynn Taborsak, 32 H.R. Proc., pt. 25, 1989 Sess., p. 8777. Federal law is to the same effect. 42 U.S.C. § 1437f (d) (1) (A).

established principles. "[O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *General Motors Corp.* v. *Dohmann*, 247 Conn. 274, 286, 722 A.2d 1205 (1998); *Ferrigno* v. *Cromwell Development Associates*, 244 Conn. 189, 195, 708 A.2d 1371 (1998)." (Internal quotation marks omitted.) *Alvarado* v. *Black*, 248 Conn. 409, 414–15, 728 A.2d 500 (1999).

Applying these principles, we consider first the words of § 46a-64c. The statute does not speak directly either to whether the broad prohibition against discrimination based on source of income requires landlords to adhere to the requirements of the section 8 program for prospective section 8 tenants, or whether a landlord's insistence on using its own lease constitutes a defense to the antidiscrimination mandate.

We must endeavor, therefore, to discern the legislature's intent by considering the legislative history of § 46a-64c, the circumstances surrounding its enactment, and the legislative policy behind that statute. In introducing to the legislature the bill that enacted the ban on source of income discrimination, Representative Lynn Taborsak explained that the bill was designed to provide that low income families "may not be rejected or denied a full and equal opportunity for . . . public accommodation based solely on the presence of [their lawful source of] income." 32 H.R. Proc., Pt. 25, 1989 Sess., p. 8776. Representative Taborsak emphasized that "[o]ur assistance disadvantages the people that we are trying to shelter without the protections of this bill. Housing opportunities especially for low and moderate

income families are severely limited in Connecticut. The families we assist need an equal chance in the rental housing market." Id., p. 8777. Representative Taborsak specifically noted that "rent subsidies under federal [s]ection 8 programs" were among the lawful sources of income that the bill would protect. Id., p. 8776. Representative Taborsak's statements were echoed by Representative Walter S. Brooks, who stated that low income people were being denied housing because "landlords consistently say that 'I don't want you in this housing because, not that you don't have enough money, but because I disagree with your source of money. And I don't care if that source of money is the state or the federal government, I don't want it.' And consequently, across this state, we have many people who cannot find accommodation." Id., p. 8788.

The legislative history of § 46a-64c demonstrates that the legislature intended to prohibit landlords from denying rental opportunities to people whose source of income included federal or state housing assistance. Interpreting § 46a-64c as the trial court has, to allow an exception to its antidiscrimination provisions for those landlords who refuse to use the required section 8 lease, would eviscerate the basic protection envisioned by the statute. It would lead to the unreasonable result that while the legislature mandated that landlords may not reject tenants because their income included section 8 assistance, the legislature at the same time also intended that landlords might avoid the statutory mandate by refusing to accede to a condition essential to its fulfillment. Such a result is untenable. "Statutes are to be construed in a manner that will not thwart [their] intended purpose or lead to absurd results. . . . *Coley* v. *Camden Associates, Inc.*, 243 Conn. 311, 319, 702 A.2d 1180 (1997)." (Internal quotation marks omitted.) *Shawmut Mortgage Co.* v. *Wheat*, 245 Conn. 744, 749, 717 A.2d 664 (1998). "It is . . . a rule of statutory

construction that those who promulgate statutes or rules do not intend to promulgate statutes or rules that lead to absurd consequences or bizarre results. . . . *Ferrigno* v. *Cromwell Development Associates*, 244 Conn. 189, 201, 708 A.2d 1371 (1998); *State* v. *DeFrancesco*, 235 Conn. 426, 437, 668 A.2d 348 (1995)." (Internal quotation marks omitted.) *Ensign-Bickford Realty Corp.* v. *Zoning Commission*, 245 Conn. 257, 270, 715 A.2d 701 (1998). "The unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result." *State* v. *Campbell*, 180 Conn. 557, 563, 429 A.2d 960 (1980).[25]

In coming to the contrary conclusion, the trial court expressed its doubt that the legislature was familiar with the federal requirements governing the section 8 program. Echoing the trial court's concern, the defendant argues that the legislature ordinarily is presumed to have knowledge only of its own existing statutes, not other directives. See, e.g., *Stern* v. *Allied Van Lines, Inc.*, 246 Conn. 170, 180, 717 A.2d 195 (1998); but see

---

[25] Moreover, we often have construed statutes or acts of the legislature in such a way as to fulfill their basic purpose, even when that construction went beyond, or seemed contrary to, the statutes' facial requirements. See, e.g., *Butler* v. *Hartford Technical Institute, Inc.*, 243 Conn. 454, 463–64, 704 A.2d 222 (1997) (individual can be held liable as "employer" implicit in General Statutes § 31-72); *Coley* v. *Camden Associates, Inc.*, supra, 243 Conn. 323 (retroactivity implicit in General Statutes § 31-301 [f]); *Doe* v. *Marselle*, 236 Conn. 845, 860–61, 675 A.2d 835 (1996) (General Statutes § 19-590 read to require only "knowing" disclosure of HIV information); *Paige* v. *Town Plan & Zoning Commission*, 235 Conn. 448, 461–62, 668 A.2d 340 (1995) (no "economic value" requirement in General Statutes § 22a-19 [a]); *Turner* v. *Turner*, 219 Conn. 703, 720, 595 A.2d 297 (1991) (General Statutes § 46b-86 construed to allow court to modify dissolution orders entered before statute was amended); *Mahoney* v. *Lensink*, 213 Conn. 548, 558, 569 A.2d 518 (1990) (General Statutes § 17-206k construed to abrogate sovereign immunity as "necessary implication" of Patients' Bill of Rights); *Bergner* v. *State*, 144 Conn. 282, 288–89, 130 A.2d 293 (1957) (waiver of state's immunity from tort liability read into special act of General Assembly).

*Kellems* v. *Brown,* 163 Conn. 478, 514–16, 313 A.2d 53 (1972), appeal dismissed, 409 U.S. 1099, 93 S. Ct. 911, 34 L. Ed. 2d 678 (1973) (presuming General Assembly's familiarity with tax commissioner's definition of "net gain" and with federal regulations and practice in area of income tax).

Whatever the merits of these concerns may be under other circumstances, they are not persuasive here. The legislature specifically demonstrated its actual knowledge of the federal requirements for section 8 assistance when it enacted Connecticut's own rental assistance program (state program).[26]

The legislature created the state program, in 1985, as a pilot rental assistance program modeled after the existing federal section 8 program. The state program was enacted pursuant to a 1985 special report to the legislature, which documented that the reporting committee had reviewed the federal section 8 existing housing program, and that it recommended that a major portion of the state program should "be structured much like . . . the [f]ederal [s]ection 8 [e]xisting [p]rogram." Department of Housing Report, "State-Funded Rent Subsidy Pilot Program for Low Income Tenants in Private Rental Housing," February 8, 1985, pp. 1, 12. Commenting at the time of the state program's enactment, Representative Alice V. Meyer, the sponsor, stated the legislature's intent was to "piggyback [the state program] on the federal [s]ection 8 subsidy program which is already in existence . . . so that this could be done in a very similar manner to what is currently being done [in the federal program]." 28 H.R. Proc., Pt. 23, 1985 Sess., pp. 8682–83. When the state pilot program expired in 1987, the legislature considered and passed Public Acts 1987, No. 87-517, which

[26] The provisions of the state program are set out in General Statutes § 17b-812.

made the state program permanent. In the course of considering the state program, Representative Richard Blumenthal, the bill's sponsor, stated that the income eligibility criteria of the state program were based on figures "that [have] been used consistently in the [d]epartment of [h]ousing [r]egulations." 30 H.R. Proc., Pt. 32, 1987 Sess., p. 11874.

At the time when the legislature created the state program, and when it made that program permanent two years later, the federal regulations contained the very section 8 lease provisions that the trial court deemed to have been beyond the legislature's knowledge. See 24 C.F.R. § 882.112 (1985) (security deposits); § 882.215 (just-cause eviction); § 882.209 (j) (use of standardized section 8 lease). The legislature's incorporation of section 8 program requirements into the state program requires us to conclude the opposite, that the legislature was well aware of section 8 regulations when it considered the antidiscrimination statute now before us.

The legislature enacted the general prohibition against lawful source of income discrimination contained in § 46a-64c only four years after it had first enacted the state program, and only two years after it had made that program permanent. Public Acts 1989, No. 89-288; see also Public Acts 1990, No. 90-246. We are persuaded that, because the legislature had actual knowledge of the federal regulations governing section 8 in both 1985 and 1987, that knowledge informed the legislature's collective awareness when, in 1989, it adopted a prohibition of discrimination on the basis of "lawful source of income."

Even if we were doubtful, however, about the depth of the legislature's understanding of the section 8 program, we should not read into a remedial statute an

unstated exception that would undermine the legislature's manifest intent to afford low income families access to the rental housing market. 32 H.R. Proc., supra, p. 8777. The principles of statutory construction direct us to construe remedial statutes "liberally in order to effectuate the legislature's intent." *Knight* v. *F.L. Roberts & Co.*, 241 Conn. 466, 474, 696 A.2d 1249 (1997); *Okee Industries, Inc.* v. *National Grange Mutual Ins. Co.*, 225 Conn. 367, 373, 623 A.2d 483 (1993).

Finally, subsequent decisions of the legislature not to enact proposed modifications to § 46a-64c reinforce the conclusion that the legislature did not intend its prohibition against source of income discrimination in housing to include an exception for landlords who did not want to accept the lease terms of the section 8 program. On two occasions, bills were introduced in the legislature that explicitly would have added such an exception to the provisions of § 46a-64c. Both bills failed.[27] In choosing not to enact this exception to the antidiscrimination mandate, the legislature was aware of the commission's policy and practice of interpreting § 46a-64c as requiring landlords to use section 8 leases for section 8 tenants.[28]

---

[27] In 1992, the legislature considered House Bill No. 5008, which contained a provision that would have amended § 46a-64c to provide that a landlord does not discriminate on the basis of source of income by refusing to accept section 8 lease conditions. Proposed House Bill No. 5008. The legislature passed House Bill No. 5008, but without the provision amending § 46a-64c. In 1991, House Bill No. 6286, was introduced. It consisted of an identical exception to § 46a-64c. Proposed House Bill No. 6286. Despite extensive testimony and discussion of the bill in the judiciary committee, the bill never reached the floor of the House of Representatives.

[28] In the course of considering House Bill No. 6286, the House of Representatives Judiciary Committee heard testimony from the commission's executive director. He testified that, since the 1989 enactment of the prohibition against discrimination based on source of income, the commission consistently had interpreted that provision to mean that a landlord's refusal to sign a standardized section 8 lease because that landlord did not want to accept the lease's set terms constituted a banned discriminatory practice. Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1991 Sess., pp. 279–80.

" '[T]he legislature is presumed to be aware of the interpretation of a statute and . . . its subsequent non-action may be understood as a validation of that interpretation.' " *Martin* v. *Plainville*, 240 Conn. 105, 110, 689 A.2d 1125 (1997); *Union Trust Co.* v. *Heggelund*, 219 Conn. 620, 627, 594 A.2d 464 (1991).[29] Although we usually have given weight to legislative inaction following a *judicial* construction of a statute, on occasion we also have noted the significance of legislative inaction following an *administrative* construction of a statute. See *Hansen* v. *Gordon*, 221 Conn. 29, 36, 602 A.2d 560 (1992) (worker's compensation review division's interpretation); *Connecticut Light & Power Co.* v. *Public Utilities Control Authority*, 176 Conn. 191, 198, 405 A.2d 638 (1978) (public utilities control authority); *Housing Authority* v. *Dorsey*, 164 Conn. 247, 253, 320 A.2d 820, cert. denied, 414 U.S. 1043, 94 S. Ct. 548, 38 L. Ed. 2d 335 (1973) (attorney general); see also *Cummings* v. *Twin Mfg., Inc.*, 29 Conn. App. 249, 256, 614 A.2d 857 (1992) (compensation review division); *Meehan* v. *Welfare Commissioner*, 34 Conn. Sup. 524, 526, 373 A.2d 1212 (1976) (congressional acquiescence in administrative interpretation of regulation; two years of congressional silence sufficient to indicate acquiescence).

In sum, for all the reasons discussed, we conclude that the legislature, in requiring landlords to make rental

---

[29] Although in *Conway* v. *Wilton*, 238 Conn. 653, 680, 680 A.2d 242 (1996), we questioned the persuasive value of a presumption of legislative agreement when the legislature has not had sufficient opportunity to respond and when other considerations seem particularly compelling, the doctrine itself is by no means dead. We have employed the legislative concurrence doctrine a number of times since *Conway*. See *Prato* v. *New Haven*, 246 Conn. 638, 647, 717 A.2d 1216 (1998); *Bocchino* v. *Nationwide Mutual Fire Ins. Co.*, 246 Conn. 378, 386, 716 A.2d 883 (1998); *Hanson* v. *Transportation General, Inc.*, 245 Conn. 613, 618–19, 716 A.2d 857 (1998); *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 297, 695 A.2d 1051 (1997); *Martin* v. *Plainville*, supra, 240 Conn. 110.

housing available to potential tenants relying on section 8 housing assistance, intended thereby to require landlords to use section 8 leases.[30] We reach this conclusion because, under the federal law applicable at the time in question, the failure to use such a lease would have resulted in the denial of section 8 reimbursement as a matter of federal law. Any other construction of § 46a-64c would be impossible to reconcile with the legislature's expressed purpose of affording to those protected by the statute "an equal chance in the rental housing market." 32 H.R. Proc., supra, p. 8777.[31]

V

INSUFFICIENT INCOME EXCEPTION

The defendant argues, in the alternative, that even if § 46a-64c does not permit it to insist on using its own lease form, its refusal to rent to the relators in this case was justified by the statutory exception for "insufficient income." The prohibition in § 46a-64c against discrimi-

---

[30] We do not agree with the assertion, in the dissent by Justice McDonald, that our holding "will have a negative effect upon investment in decent rental units in Connecticut." Such an assertion is rebutted by the legislative history surrounding the 1992 failure to amend § 46a-64c. See footnote 27 of this opinion. At the Judiciary Committee hearings on the proposed amendment, the only landlord to testify was William Cornish, the president of the New London County Landlords' Association. Cornish spoke *in favor* of the section 8 program, stating that, "[i]f there's an idea that there's something in there that says we're going to discriminate against [s]ection 8, throw it out. . . . Nobody objects to [s]ection 8. *Section 8 right now is one of the most desireable tenants you could have* because three-quarters of the rent goes right to me. . . . In fact, just coincidentally, [my section 8 tenant] is the best tenant in that building. This woman washes the outside of her porch, the woodwork on the outside of the building and I [get] three-quarters of the rent and she has never been late with the others and that's my experience." (Emphasis added.) Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1992 Sess., p. 428.

[31] We note that the defendant has not pursued, on appeal, any constitutional claims about the validity of § 46a-64c, except insofar as it raises a question of federal preemption, which we have addressed in part III of this opinion.

nation on the basis of lawful source of income[32] contains an exception in § 46a-64c (b) (5), which provides that "[t]he provisions of this section with respect to the prohibition of discrimination on the basis of lawful source of income shall not prohibit the denial of full and equal accommodations solely on the basis of insufficient income." As part of its standard practice, the defendant consistently required any potential tenant to have a minimum weekly income that approximated or equaled the amount of the total monthly rent.[33] That minimum income requirement was authorized, according to the defendant, by the exception in § 46a-64c (b) (5).

The trial court concluded that, because the relators' income did not meet the defendant's minimum income standard, their income was "insufficient" under § 46a-64c (b) (5). It agreed with the defendant that, although the defendant's high minimum income standard resulted, in fact, in the disqualification of all low income tenants, the express terms of the statutory exception made this conduct legal. The court concluded that the statutory rule "is not to protect all low income groups, or a particular subset within the low income group,

---

[32] Section 46a-64c (a) (1) and (2) make it a discriminatory practice in violation of the section: "(1) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, creed, color, national origin, ancestry, sex, marital status, age, lawful source of income or familial status.

"(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, creed, color, national origin, ancestry, sex, marital status, age, lawful source of income or familial status."

[33] The defendant's minimum income standard required its tenants to have a weekly income that was at least equal to the monthly rent of a unit, in other words, a "4.33 to 1" income to rent ratio. Sometimes this information was given to prospective tenants in annualized form. This calculation was the basis for the information given to Roper that she could not qualify to rent the advertised house unless she had an annual income of $38,000.

but to protect all groups from discrimination based on source of income." We disagree.

A proper assessment of the merits of the trial court's conclusion requires us to consider two questions. First, what is the meaning of the term "insufficient income" in § 46a-64c (b) (5)? Second, how does that term, properly defined, apply under the circumstances of the present case? Because this case comes to us on the basis of stipulated facts, both issues present questions of law, subject to our plenary review.

A

The proper definition of "insufficient income" is a question of statutory construction, in which our task " 'involves a reasoned search for the intent of the legislature.' " *Grigerik* v. *Sharpe*, 247 Conn. 293, 301, 721 A.2d 526 (1998). In the present case, however, there is a lamentable dearth of clues as to the legislature's intent. Section 46a-64c nowhere defines the term "insufficient income." There is no legislative history that illuminates the legislature's intent in enacting such an exception to its general mandate that landlords accept tenants regardless of the source of their income. No legislator addressed the facial inconsistency between making it mandatory for landlords to accept low income section 8 tenants and making it permissible for landlords to reject tenants with an "insufficient income."

Confronted with the lack of a statutory definition, the trial court concluded that "the legislature appears to have left [the determination of insufficient income] to the business discretion of the property owners." The defendant, amplifying this view, emphasizes that the purpose of its own minimum income requirement is not to discriminate but to reflect economic judgments that it reached long before the enactment of § 46a-64c and uniformly has implemented since then. The defendant

notes, in addition, that the absence of statutory standards for what constitutes "insufficient income" does not authorize courts, or the commission arbitrarily to denominate some sum of money to fill the statutory gap.

The commission responds that the trial court's construction is untenable because it undercuts the fundamental mission of § 46a-64c. We agree with the commission that, in light of the lack of a statutory or historical definition, we must construe § 46a-64c (b) (5) in terms of the overall legislative purpose manifested by this remedial statute. "[I]n construing [a statute's] meaning, we are guided by . . . the underlying legislative purpose of the harm at which it is directed. We pay particular attention to the societal [problem] which the legislature sought to address . . . in determining the true meaning of the statute." (Internal quotation marks omitted.) *Doe* v. *Marselle*, 236 Conn. 845, 851, 675 A.2d 835 (1996). We also agree with the defendant, however, that, in the absence of guidance from the legislature, we cannot simply designate an independent numeric requirement as the determinant of what constitutes "insufficient income."

The purpose of the relevant provisions of § 46a-64c is to prevent low income families from being "rejected or denied a full and equal opportunity for . . . public accommodation based solely on the presence of" a particular source of income. 32 H.R. Proc., supra, p. 8776, remarks of Representative Taborsak. It would be inconsistent with the remedial mandate of § 46a-64c for the legislature to have afforded to landlords carte blanche authority to define the term "insufficient income" so as to qualify for the exception in § 46a-64c (b) (5). Such a construction would swallow the statute whole and render it meaningless. We have long held to the rule that statutory exceptions are to be strictly construed. *Conservation Commission* v. *Price*, 193 Conn. 414, 424, 479 A.2d 187 (1984). In light of the remedial nature of

the statute, we are not persuaded that the legislature contemplated such a hands-off approach.

A closer examination of the statute makes it clear that the exception is not as lacking in standards as would appear on first reading. We may obtain useful guidance by considering the common meaning of the statute's terms. See General Statutes § 1-1. The word "sufficient" is a relative term. Black's Law Dictionary (6th Ed. 1990) defines it as "[a]dequate, enough, as much as may be necessary, equal or fit *for end proposed*, and that which may be necessary *to accomplish an object*. Of such quality, number, force, or value *as to serve a need or purpose*." (Emphasis added.)

In determining the contours of the exception afforded by § 46a-64c (b) (5), we, therefore, must consider the meaning of "insufficient income" with respect to the need or purpose that the income is to serve. The reasonable need or purpose that the legislature would likely have considered, with respect to the statute, would be the sufficiency of the tenant's income to meeting his or her own financial obligations to the landlord, ordinarily the tenant's own periodic rental obligation.

Although the commission does not say so expressly, it seems to take the position that, because section 8 rental assistance payments are calculated with the expectation that the prospective tenant will have sufficient remaining income to cover the tenant's personal share of the rent, that tenant's income never will fall within the "insufficient income" exception. Perhaps an argument could be made that the statutory exception covers housing assistance payments from sources other than section 8, which may not include such an encompassing assessment of the potential tenant's overall assets and liabilities.

We are not persuaded, however, that section 8 assistance recipients categorically are excluded from the

class of potential tenants with "insufficient income" to sustain their tenancies. Such a construction of the exception would, in effect, read it out of the statute under the very circumstances in which the statute, ab initio, is most likely to apply. That cannot be what the legislature had in mind.

The more plausible construction of the statutory exception is to give it a narrow reading that comports with the policy of the statute overall. Under that narrow construction, the exception affords a landlord an opportunity to determine whether, presumably for reasons extrinsic to the section 8 housing assistance calculations, a potential tenant lacks sufficient income to give the landlord reasonable assurance that the tenant's portion of the stipulated rental will be paid promptly and that the tenant will undertake to meet the other obligations implied in the tenancy. The statutory exception does not prescribe a single methodology for making such a determination, and in that respect, as the trial court held, leaves room for discretion to be exercised by the landlord. It does contemplate, however, that, in accordance with the statute's antidiscrimination mandate, that any method adopted by the landlord must be applied consistently with respect to all potential tenants.

### B

In the present case, the trial court determined that because the income of the relators did not meet the defendant's minimum income standard, the relators' income was "insufficient" under the statutory exception. The court accepted the defendant's business judgment as the basis for its finding that the statutory exception applied. We disagree with that conclusion because, as we have defined it, the statutory exception must be construed more narrowly to require a showing of "insufficient income" with respect to the potential

tenant's own ability to meet his or her personal rent obligation for that part of the rental not covered by section 8 rental assistance payments and to cover other obligations reasonably associated with the tenancy.

Although we disagree with the trial court's construction of the statutory exception, we emphasize that we accept its subordinate characterization of the nature of the defendant's minimum income requirement. The good faith of the defendant's business judgment has never been questioned, and we do not question it now. The stipulated facts contain nothing to suggest that the reasons proffered by the defendant for refusing to rent to the relators were pretextual.[34] Finally, the uniformity of the defendant's leasing practices similarly is not subject to question in light of the stipulated facts.

The question remains, however, whether the defendant's standard requirement that each potential tenant have a gross weekly income that approximates one month's rent bore a reasonable relationship to the defendant's ability to enforce the potential tenant's personal rental obligation. If the defendant's formula is applied to the raw numbers of the relators' incomes, its requirements are amply met. Hanson had an income of $581 a month (or $135 a week) to cover a personal rental obligation of $11; Roper had a monthly income of $776 (or $181 a week) to cover a monthly rental obligation of $64. As the defendant notes, however, these figures do not take into account those parts of the tenant's disposable income that must cover items

---

[34] The record reveals that the defendant stated that it was rejecting Roper both because she did not meet its minimum income standard and because of the section 8 security deposit requirement. With respect to its rejection of Hanson, the only reason proffered by the defendant at the time was that section 8 would not allow two months' rent as security. The defendant claims now that its rejection of Hanson also falls under the statutory exception because "if the conversation [with Hanson] had progressed, the applicant's low income would inevitably have emerged . . . ."

such as the tenant's utility expenses, which, according to the defendant's estimates, would have amounted to roughly $227 a month.[35] Furthermore, they do not address the tenant's ability to reimburse the defendant if, hypothetically, damages to the rented property were to exceed the amount of the stipulated two month rental deposit. These were not, however, the articulated bases for the defendant's decision not to rent to the relators in this case.

In short, on the stipulated factual record of the reasons given for turning down the relators, the defendant has failed to demonstrate that the relators in the present case have "insufficient income" to qualify them as tenants for the defendant's rental property. Although we could direct the entry of a judgment on liability on this basis, we are persuaded that the defendant should be afforded a fair opportunity to make such a showing if it can.

The present case is the first instance in which we have construed the text of § 46a-64c. Our narrow construction of the statutory exception for "insufficient income" contemplates a specific fact-bound determination of a potential tenant's capacity to carry his or her part of the bargain. The construction that we have adopted departs significantly from that urged at trial, or in this court, by the commission. The defendant deserves the chance to make its case in accordance with our ground rules.

We emphasize that our order for a new trial is limited to the issue of whether the defendant can establish that the relators properly were denied access to his rental

---

[35] The stipulated facts describe these figures as the defendant's estimates, without stipulating to their accuracy. The stipulated facts do not indicate whether utility cost estimates played a role in the application of the defendant's formula to potential tenants whose rental obligations were entirely their own.

property because they had "insufficient income" within the exception contained in § 46a-64c (b) (5). The burden of proving its eligibility for the exception must be assumed by the defendant. "[T]hose who claim the benefit of an exception under a statute have the burden of proving that they come within the limited class for whose benefit it was established." *Conservation Commission* v. *Price*, supra, 193 Conn. 424; *Gay & Lesbian Law Students Assn.* v. *Board of Trustees*, 236 Conn. 453, 473–74, 673 A.2d 484 (1996). To determine whether the defendant has met its burden, a finder of fact on this issue properly may consider criteria that include, but are not limited to, the potential tenant's income, personal rental obligation, foreseeable utility expenses and foreseeable liability for other than ordinary wear and tear.

In light of the nondiscriminatory purpose for which § 46a-64c was enacted, the defendant may not rely solely on section 8 eligibility as a basis for turning potential tenants away nor may it apply more stringent income requirements to section 8 rental applicants than to other rental applicants.[36] Even if the defendant demonstrably treats all rental applicants the same, however, its facially neutral conduct is not sufficient to avoid liability under the statute if such neutral conduct has a disparate impact on potential section 8 reimbursement tenants. See *Levy* v. *Commission on Human Rights & Opportunities*, 236 Conn. 96, 103, 671 A.2d 349 (1996); see also *Hazen Paper Co.* v. *Biggins*, 507 U.S. 604, 609, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993), citing *Teamsters* v. *United States*, 431 U.S. 324, 335–36 n.15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977). Indeed, the legislative exception for "insufficient income" can be

---

[36] Nothing in the present record would support a claim that the conduct of the defendant demonstrates disparate treatment of potential tenants relying on section 8 reimbursement for part of their potential rental obligations.

read as defining and incorporating the "business necessity" defense that is contemplated by the disparate impact portion of our antidiscrimination law.

Unless the defendant makes the requisite showing that the relators had "insufficient income" to meet the totality of their rental obligations, the commission is entitled to prevail on the issue of liability. In that event, there must be a hearing on what the proper remedy should be.

The judgments are reversed and the cases are remanded for a new trial limited to the issue of whether the relators had insufficient income within the meaning of § 46a-64c (b) (5) and, in the event that the commission prevails on the issue of the defendant's liability, for a hearing to determine the appropriate remedy.

In this opinion NORCOTT and PALMER, Js., concurred.

CALLAHAN, C. J., with whom MCDONALD, J., joins, dissenting. The defendant, Sullivan Associates, the owner of residential rental properties located in Bridgeport, rejected all prospective tenants who lacked gross weekly income close to or exceeding one month's rent. I would conclude that the defendant's minimum income requirement does not constitute a discriminatory practice in violation of General Statutes § 46a-64c.[1] I therefore respectfully dissent.

---

[1] General Statutes § 46a-64c provides in relevant part: "(a) It shall be a discriminatory practice in violation of this section:

"(1) To refuse to sell or rent . . . a dwelling to any person because of . . . lawful source of income . . . .

"(2) To discriminate against any person in the terms . . . of . . . rental of a dwelling . . . because of . . . lawful source of income . . . .

"(b) . . . (5) The provisions of this section with respect to the prohibition of discrimination on the basis of lawful source of income shall not prohibit the denial of full and equal accommodations solely on the basis of insufficient income. . . ."

The following undisputed facts are relevant to this appeal. The defendant is the owner of residential rental properties. In renting its properties, the defendant followed a standardized policy. Specifically, once a vacancy had been advertised, the defendant asked callers responding to the advertisement to identify themselves, their coresidents and their gross household income. The property available for rental then was identified and shown to the caller only if the caller's gross weekly income was close to or exceeded a single month's rent, and the caller agreed to furnish two months rent as security.

On March 2, 1994, the defendant placed an advertisement in the Connecticut Post stating: "BRIDGEPORT Lindley St. 3 BR HOUSE New Paint & Carpets. $750/Mo. 366-2564." That same day, Patricia Hanson, a single parent of two minor children, called the defendant to inquire about the advertised rental property. After Hanson informed the defendant that her income was derived from rent subsidies under section 8 of the housing assistance program of the National Housing Act of 1974 (section 8); 42 U.S.C. § 1437f; and the federal Aid to Families with Dependent Children program; 42 U.S.C. § 601 et seq.; she was told that the defendant did not qualify to rent to tenants with section 8 subsidies because the defendant required two months security, and the section 8 program, as the defendant understood it, would not allow such security.

On April 18, 1994, Patricia Roper, a single parent of three minor children, called the defendant to inquire about rental housing. Upon being told that section 8 was Roper's only source of income, the defendant informed Roper that an annual income of $38,000 was required to qualify to rent the advertised property.

On June 6, 1994, the defendant placed a newspaper advertisement offering another of its properties for rent.

Roper also responded to that advertisement. She informed the defendant that she had a section 8 certificate to pay the rent. Roper was told that she was not eligible to rent the advertised property because her income did not meet the defendant's $38,000 requirement and because, contrary to the section 8 requirements, the defendant required two months rent as security.

Hanson and Roper subsequently filed separate complaints with the plaintiff, the commission on human rights and opportunities (commission), alleging that the defendant's refusals to accept Hanson and Roper as tenants constituted discrimination against them because they received a rent subsidy—a "lawful source of income"—in violation of § 46a-64c (a). Thereafter, pursuant to General Statutes § 46a-89, the commission brought separate actions against the defendant on behalf of Hanson and Roper. After consolidating the two actions, the trial court rendered judgment for the defendant. This appeal followed.

"In construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Ferrigno* v. *Cromwell Development Associates*, 244 Conn. 189, 195, 708 A.2d 1371 (1998).

Section 46a-64c (a) provides in relevant part: "(a) It shall be a discriminatory practice in violation of this section: (1) To refuse to sell or rent . . . a dwelling to any person because of . . . lawful source of income . . . . (2) To discriminate against any person in the

terms . . . of . . . rental of a dwelling . . . *because* of . . . lawful source of income . . . ." (Emphasis added.) General Statutes § 46a-63 provides in relevant part that, as used in § 46a-64c, " '[l]awful source of income' means income derived from social security, supplemental security income, housing assistance, child support, alimony or public or general assistance." Thus, by its terms, § 46a-64c indicates that the legislature intended to prohibit a residential landlord from refusing to accept a prospective tenant *because* the prospective tenant's income includes section 8 housing assistance.

The legislative history of § 46a-64c, moreover, unequivocally indicates that the legislature intended that § 46a-64c prohibit a residential landlord from refusing to accept a prospective tenant *because* the prospective tenant's income is derived from section 8 housing assistance. The statutory provisions prohibiting discrimination because of a "lawful source of income" were enacted in 1989, and initially were codified as General Statutes (Rev. to 1991) § 46a-64. See Public Acts 1989, No. 89-288 (P.A. 89-288). During the discussion on the floor of the House of Representatives of House Bill No. 5916, which was enacted as P.A. 89-288 and codified as part of § 46a-64, Representative Lynn Taborsak, a sponsor of the bill, remarked: "This bill defines lawful sources of income that would be protected, and they [include] . . . rent subsidies under federal Section 8 programs . . . ." 32 H.R. Proc., Pt. 25, 1989 Sess., p. 8776. I would conclude, therefore, that the legislature intended that § 46a-64c prohibit a residential landlord from refusing to accept a prospective tenant *because* the prospective tenant's income is derived from section 8 housing assistance.

The language, legislative history and genealogy of § 46a-64c also reveal, however, that the legislature intended that the statute prohibit discrimination on the

basis of *source of income,* but that it not prohibit discrimination on the basis of an *insufficient amount of income.* As originally enacted, P.A. 89-288, § 2, provided in relevant part: "It shall be a discriminatory practice in violation of this section: (1) To deny any person . . . *full and equal* accommodations in any place of public accommodation . . . because of . . . lawful source of income . . . ." Thus, the original statutory language manifested an intention that persons receiving section 8 housing assistance be treated on an *equal* basis with similarly situated individuals who are not section 8 housing assistance recipients. Further, P.A. 89-288, § (2) (b) (7), which now is codified at § 46a-64c (b) (5), provided in relevant part: "The provisions of this section with respect to the prohibition of discrimination on the basis of lawful source of income *shall not prohibit* the denial of full and equal accommodations solely on the basis of insufficient income." This language is clear evidence that the legislature did not intend that landlords be prohibited from rejecting prospective applicants on the basis of their level of income.

During the discussion of House Bill No. 5916 on the floor of the House of Representatives, moreover, Representative Taborsak stated: "When a [prospective] tenant lists his or her income on a rental application and all or part of that income is derived from one or more of these programs, he or she may not be rejected or denied a full and *equal opportunity* for that public accommodation based solely on the presence of that income. Tenants may be rejected for other valid reasons. For no apparent or steady source of income. For insufficient income. . . . [F]or poor credit . . . ." (Emphasis added.) 32 H.R. Proc., supra, pp. 8776–77. During that same discussion, Representative Richard O. Belden stated: "[W]e are going to say that an individual landlord can't consider whether or not the person is employed or *where their source of income is coming from* in

the consideration of whether or not he wants to rent somebody a house." (Emphasis added.) Id., p. 8778. Representative Walter S. Brooks similarly explained the need for the proposed legislation: "[L]andlords consistently say that 'I don't want you in this housing because, not that you don't have enough money, but *because I disagree with your source of money.* And I don't care if that source of money is the state or federal government, I don't want it.' " (Emphasis added.) Id., p. 8788. The remarks of Representatives Taborsak, Belden and Brooks reveal that in enacting P.A. 89-288, the legislature recognized a distinction between the source of an applicant's income and the amount of an applicant's income, and that § 46a-64c was intended only to prohibit a landlord from discriminating on the basis of source of income, and not on the basis of amount of income. I would conclude, therefore, that discrimination on the basis of the level of income is not a practice prohibited by § 46a-64c.

The majority concludes, however, that § 46a-64c requires that the defendant demonstrate that its minimum income requirement bears a reasonable relationship to its ability to enforce the rent obligations of Hanson and Roper. I disagree for the following three reasons. First, in explaining which practices were prohibited by the statutes and which were not, Representative Taborsak stated: "A landlord who offers an apartment may not discriminate based on [lawful source of income or other statutory provision]. Outside of those specific instances, the landlord may offer the accommodation and through that acquire a group of [prospective] tenants. Within that group of [prospective] tenants, he may select the tenant of his or her liking, *his or her preference,* based on what is in the application, references, occupational background. He may not discriminate based on the statutory protections, but in the pool of [prospective] tenants that apply

for that public accommodation, he has the ability to select the tenant that best suits . . . *his own personal preference.*" (Emphasis added.) 32 H.R. Proc., supra, pp. 8784–85. Representative Taborsak's remarks seem to me to indicate unequivocally that the legislature intended that determinations regarding practices not prohibited by the statute—such as the income level to be required of tenants—are within the sole province of the landlord.

Second, Representative Taborsak stated unequivocally that "[t]enants may be rejected for other valid reasons. For no apparent or steady source of income. For insufficient income. . . . *[F]or poor credit . . . .*" (Emphasis added.) Id., pp. 8776–77.These statements are clear evidence that the legislature recognized that a landlord's legitimate business interests under § 46a-64c are not limited to ensuring that a tenant is capable of meeting rent obligations, but also properly include ensuring that the tenant is capable of satisfying other obligations such as performing required maintenance or reimbursing the landlord for damages done to the rental property during the course of the tenancy.

Finally, as previously indicated, in 1989, the legislature amended the public accommodation discrimination statute; General Statutes § 46a-64; to prohibit discrimination on the basis of lawful source of income. See P.A. 89-288. At the time of the enactment of P.A. 89-288, it was well established that the evidentiary framework that governs federal housing and employment discrimination claims was applicable to housing discrimination claims brought pursuant to § 46a-64. See *Chestnut Realty, Inc.* v. *Commission on Human Rights & Opportunities*, 201 Conn. 350, 358, 514 A.2d 749 (1986); *Zlokower* v. *Commission on Human Rights & Opportunities*, 200 Conn. 261, 264, 510 A.2d 985 (1986). In 1990, the legislature further amended § 46a-64 to remove from that statute the prohibitions

addressing housing discrimination and to reenact them as part of a separate fair housing statute. See Public Acts 1990, No. 90-246 (P.A. 90-246). The legislative history of House Bill No. 5958, which eventually was enacted as P.A. 90-246 and codified as § 46a-64c, reveals that the legislature intended that § 46a-64c conform to the standards governing the federal fair housing laws. See 33 H.R. Proc., Pt. 24, 1990 Sess., p. 8359 (entitled "An Act Adopting a Comprehensive Connecticut Fair Housing Statute Conforming to the Federal Fair Housing Act"); see also Report on Bills Favorably Reported by Committee (bill would bring state statutes into conformance with federal fair housing law). I would conclude, therefore, that the evidentiary framework that governs federal housing and employment discrimination claims is applicable in the present case.

"Under federal law, there are four general theories of . . . discrimination: disparate treatment, adverse or disparate impact, perpetuation into the present of the effects of past discrimination, and failure to make a reasonable accommodation." *Levy* v. *Commission on Human Rights & Opportunities*, 236 Conn. 96, 103–104, 671 A.2d 349 (1996); see also *Chestnut Realty, Inc.* v. *Commission on Human Rights & Opportunities*, supra, 201 Conn. 358. This appeal requires consideration of only the "disparate treatment" type of case.

"The principal inquiry of a disparate treatment case is whether the plaintiff was subjected to different treatment *because of his or her protected status*." (Emphasis added.) *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn 104. "Under the analysis of the disparate treatment theory of liability, there are two general methods to allocate the burdens of proof: (1) the mixed-motive/*Price Waterhouse* model; *Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 246, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989); and (2) the pretext/*McDonnell Douglas-Burdine* model. *Texas Dept. of*

*Community Affairs* v. *Burdine*, 450 U.S. 248, 252–56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." *Levy* v. *Commission on Human Rights & Opportunities*, supra, 104–105.

"A 'mixed-motive' case exists when an employment decision is motivated by both legitimate and illegitimate reasons. See *Price Waterhouse* v. *Hopkins*, supra, 490 U.S. 228 (plurality opinion). In such instances, a plaintiff must demonstrate that the employer's decision was motivated by one or more prohibited statutory factors. Whether through direct evidence or circumstantial evidence, a plaintiff must 'submit enough evidence that, if believed, could reasonably allow a [fact finder] to conclude that the adverse employment consequences resulted "because of" an impermissible factor.' *Tyler* v. *Bethlehem Steel Corp.*, 958 F.2d 1176, 1187 (2d Cir. 1992)." *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 105.

"Under this model, the plaintiff's prima facie case requires that the plaintiff prove by a preponderance of the evidence that he or she is within a protected class and that an impermissible factor played a 'motivating' or 'substantial' role in the employment decision. *Price Waterhouse* v. *Hopkins*, supra, [490 U.S.] 258; *Mt. Healthy City Board of Education* v. *Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977); *Tyler* v. *Bethlehem Steel Corp.*, supra, 958 F.2d 1181 ('[s]hould the plaintiff wish to prove his case as a "mixed-motives" case, he must focus his proof directly at the question of discrimination and prove that an illegitimate factor had a "motivating" or "substantial" role in the employment decision')." *Levy* v. *Commission on Human Rights & Opportunities*, supra, 236 Conn. 106.

"Once the plaintiff has established his prima facie case, the burden of production and persuasion shifts

to the defendant. '[T]he defendant may avoid a finding of liability only by proving by a preponderance of the evidence that *it would have made the same decision even if it had not taken [the impermissible factor] into account.' Price Waterhouse* v. *Hopkins,* supra, 490 U.S. 258; *Mt. Healthy City Board of Education* v. *Doyle,* supra, 429 U.S. 274; see *In re McCort,* 161 Vt. 481, 490–91, 650 A.2d 504 (1994) (adopting under its own antidiscrimination statute the burden shifting form of analysis for mixed-motive cases)." (Emphasis added.) *Levy* v. *Commission on Human Rights & Opportunities,* supra, 236 Conn. 106–107.

In the present case, the defendant claims that it rejected Hanson and Roper as tenants on the basis of: (1) its minimum income policy; and (2) its objections to the provisions of section 8 leases. Even if the majority is correct that § 46a-64c does not permit a landlord to reject a prospective tenant on the basis of objections to the provisions of section 8 leases,[2] under the disparate

---

[2] Because I would conclude that the defendant's rejections of Hanson and Roper on the basis of the its minimum income policy does not violate § 46a-64c, I would not address the commission's claim that the defendant's rejections of Hanson and Roper on the basis of its objections to certain terms of a section 8 lease is violative of § 46a-64c.

Furthermore, if I were to address the commission's claim that the defendant's rejection of the applicants on the basis of its objections to certain terms of a section 8 lease, I would utilize the pretext/*McDonnell Douglas-Burdine* analytic model, rather than the attenuated statutory construction employed by the majority. Neither the language nor the legislative history of § 46a-64c provides any indication that the legislature intended that § 46a-64c require landlords to accept, under all circumstances, any and all terms that the federal government imposes upon section 8 leases. I am not persuaded, moreover, that the legislature's subsequent failure to enact legislation specifying that § 46a-64c does not require landlords to accept such terms compels a conclusion to the contrary. During the committee hearing on the proposed, but never enacted, legislation, Representatives Richard Tulisano and Douglas Mintz vigorously argued that § 46a-64c does not require landlords to accept the terms of section 8 leases. See, e.g., Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1991 Sess., pp. 276–78. It also seems to me that, in light of the fact that none of the other enumerated "[l]awful source[s] of income"; see General Statutes § 46a-63; imposes lease obligations upon landlords, the legislature's familiarity in 1985, with the

treatment mixed-motive analysis,[3] the defendant may avoid liability for its actions by establishing that it would have rejected Hanson and Roper even if they had not been section 8 housing assistance recipients. *Levy* v. *Commission on Human Rights & Opportunities,* supra, 236 Conn. 106; see also *Price Waterhouse* v. *Hopkins,* supra, 490 U.S. 258; *Mt. Healthy City Board of Education* v. *Doyle,* supra, 429 U.S. 287. In the present case, *it is undisputed that the defendant had a long-standing policy of rejecting all applicants whose gross*

---

federal section 8 program is not an adequate foundation for a conclusion that in enacting P.A. 89-288 in 1989, the legislature in fact intended that landlords be required to accept any and all terms the federal government imposes upon section 8 leases.

The commission's claim that the defendant's rejections of Hanson and Roper on the basis of certain objections to the terms of section 8 leases is violative of § 46a-64c is, in fact, simply a disparate treatment claim. In my view, the pretext/*McDonnell Douglas-Burdine* model, rather than an attenuated statutory construction, is the proper framework for analysis of such claims.

[3] The commission apparently did not raise an adverse or disparate impact claim with respect to the defendant's minimum income requirement or its objections to the security deposit provisions of a section 8 lease. Facially neutral practices, such as the defendant's minimum income policy and its security deposit policy, properly are analyzed under the disparate impact model set forth in *Wards Cove Packing Co.* v. *Atonio,* 490 U.S. 642, 658–59, 109 S. Ct. 2115, 104 L. Ed. 2d 733 (1989). "In order to prevail on a disparate impact claim, a plaintiff must initially establish a prima facie case of discrimination. A plaintiff makes such a showing by first pointing out the specific . . . practice it is challenging and then demonstrating that the challenged . . . practice caused a significant disparate impact on a protected group." *Equal Employment Opportunity Commission* v. *Joint Apprenticeship Committee,* 164 F.3d 89, 95 (2d Cir. 1998). "[T]he disparate impact analysis does not end once the plaintiff has established a prima facie case. Instead, the case shifts to the defendant to show a business justification for the challenged . . . practice. At this phase, the defendant carries the burden of production. The ultimate burden of persuasion, however, remains at all times with the plaintiff. . . . If the defendant succeeds in producing evidence showing a business justification for the challenged . . . practice, then the plaintiff must persuade the fact finder that other tests or selection devices would also serve the defendant's legitimate . . . goals without producing a similarly undesirable disparate effect." (Citations omitted.) Id., 98–99.

*weekly income was less one month's rent.* It is also undisputed that neither Hanson's nor Roper's income met the defendant's minimum standard. Furthermore, the trial court concluded that there was no evidence whatsoever to suggest that the defendant's reliance on its minimum income policy to justify its rejection of Hanson and Roper was pretextual. In my view, the evidence does not permit a conclusion that the defendant would not have made the same decisions if the applicants had not been section 8 housing assistance recipients. Because the evidence does not permit a conclusion that the defendant discriminated against Hanson and Roper *because of the source of their income*— as opposed to the amount of their income—I would conclude that the defendant's actions were not violative of § 46a-64c. I therefore respectfully dissent.

MCDONALD, J., dissenting. I concur in the dissent of Chief Justice Callahan. I also wish to add that I do not agree with the majority's conclusion that, because General Statutes § 46a-64c provides that, in offering property to the public for rent, a landlord may not discriminate against prospective tenants because of their "lawful source of income," the defendant here violated § 46a-64c by refusing to accept the terms mandated in a lease under section 8 of the National Housing Act, as amended in 1974 and codified at 42 U.S.C. § 1437f (section 8).

The plain language of § 46a-64c does not support the majority's conclusion that the legislature intended to make acceptance of the terms of public assistance programs mandatory, even if such terms are in conflict with a landlord's established and universally applied renting policies. The majority's holding obliges every landlord in this state to offer its property for rent with terms that meet the requirements of section 8, other assistance programs, or any other lawful income providers. I conclude that § 46a-64c does not require this.

Instead, the statute simply means that, if all things are equal among the prospective tenants, a landlord may not disqualify a prospective tenant simply because of that tenant's status as a recipient of public assistance under the section 8 program.

I would conclude that there is not a violation of § 46a-64c every time a landlord declines to accept a lease dictated to the landlord by the tenant's income source, whether the source is a public assistance program, a spendthrift trust or some other benefactor of the tenant. If the legislature wished to impose on all landlords of this state a requirement that they accept all the lease terms required by a tenant's source of income, it simply could have said so. It did not. The legislature's addition of the language "lawful source of income" was not intended to turn every property in this state into a government regulated and "lease controlled" rental facility.

The majority's decision, which does turn every rental property in this state into a government regulated and lease controlled rental facility, is revolutionary both in terms of the law of property as well as the fundamental law of American government. Our founders established a government with three equal and separate branches. See U.S. Const., art. I, II, III. Under the separation of powers doctrine, the courts were not to become the lawmakers. A court may not create legislation simply because its members believe, for social reasons, that such legislation is necessary. See 1 J. Sutherland, Statutory Construction (5th Ed. Singer 1994) § 3.06 p. 55 (courts not empowered to rewrite statutes to suit their notions of sound public policy). As footnote 25 of the majority opinion, however, explains: "[W]e often have construed statutes or acts of the legislature in such a way as to fulfill their basic purpose, *even when that construction went beyond, or seemed contrary to, the statutes' facial requirements.*" (Emphasis added.) I

believe that this court is making laws in this case, well beyond its constitutional warrant and, in doing so, fostering bad public policy.

The majority's holding will have a negative effect upon investment in decent rental units in Connecticut. This is illustrated by New York City's experience with rent control, which could be yet another lease term mandated by a tenant's income source. Rent control had its genesis in war time to prevent gouging of soldiers and defense workers. See R. Pipes, Property and Freedom (1999) p. 262. It survives in New York City and several university towns. Id., p. 263. In New York City, rent control has helped to bring about urban decay of an unprecedented number of properties "as many landlords, unable to make any profit on their properties, either neglected or abandoned them." Id. The legislature could not have intended such a result in Connecticut.

The very implementing of statewide lease control by court fiat fails to recognize the basic American rights to property and freedom. The freedom to own and control private property is fundamental to freedom. As Harvard professor Richard Pipes concludes from his study of the failed Soviet system and other totalitarian systems, "[p]roperty is an indispensable ingredient of both prosperity and freedom." Id., p. 286.

The majority's opinion in this case requires landlords in this state either to lease on the terms dictated in a section 8 lease, or not to lease their property at all. Such a result will have profound and adverse effects on all property owners in this state. Because the statute provides for no compensation to property owners, I also would conclude that the majority's holding, when applied, results in a taking of private property from landlords without just compensation. U. S. Const., amend. V; Conn. Const., art. I, § 11; see also *San Diego Gas & Electric Co.* v. *San Diego*, 450 U.S. 621, 650,

101 S. Ct. 1287, 67 L. Ed. 2d 551 (1981) (Brennan, J., dissenting); *Pennsylvania Coal Co.* v. *Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 67 L. Ed. 322 (1922).

The defendant in this case refused to lease to the relators, Patricia Hanson and Patricia Roper, because its established requirements for renting its property were in conflict with those of the section 8 program. There is no basis, as the majority concludes, to find that the defendant crafted its rental policy in order to discriminate against section 8 recipients. I would conclude that refusing to accept the terms of a section 8 lease does not itself constitute unlawful discrimination as proscribed by § 46a-64c. I, therefore, would affirm the trial court's judgment.

Accordingly, I dissent.