# NORTHLAND INVESTMENT CORPORATION *v.* PUBLIC UTILITIES REGULATORY AUTHORITY
## (SC 20769)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Dannehy, Js.

*Syllabus*

Pursuant to statute (§ 16-262e (c)), the owner or landlord of a multiunit
residential dwelling "shall be liable for the costs of all [utility services]
furnished . . . to the building, except for any service furnished to any
dwelling unit of the building on an individually metered or billed basis
for the exclusive use of the occupants of that dwelling unit . . . ."

The plaintiff landlord, N Co., sought a declaratory ruling from the defendant,
the Public Utilities Regulatory Authority (PURA), that it may use ratio
utility billing (RUB) in recouping its costs for utility services from tenants
in two multiunit residential buildings that did not have individual meters
for each unit but, rather, had only a master meter. Under the RUB
methodology, N Co. would bill its tenants for monthly utility charges
on the basis of what it had determined to be their proportionate share
of utility usage for the month, which could be calculated by N Co. on
the basis of each unit's square footage and the number of bedrooms
and occupants, among other factors. In its final decision, PURA con-
cluded that RUB violates the plain meaning of § 16-262e (c) because
that provision expressly prohibits charging a tenant for utility services
the tenant did not exclusively use. Nevertheless, PURA explained that
N Co. could use the "building in" methodology instead and build the
estimated cost of utilities into the fixed rent charged to tenants each
month. N Co. filed an administrative appeal from PURA's decision, and
the trial court remanded the case to PURA for further consideration of
whether PURA's decision that RUB violates § 16-262e (c) conflicts with
its conclusion that the "building in" approach does not similarly violate
the statute. PURA issued a supplemental decision in which it reaffirmed
its prior ruling. N Co. appealed from PURA's supplemental decision to the

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

trial court, which dismissed the appeal and rendered judgment thereon. Thereafter, N Co. appealed from the trial court's judgment.

*Held* that the trial court did not err in upholding PURA's determination that § 16-262e (c) prohibits N Co.'s proposed use of RUB to recoup building wide utility costs by billing tenants for their estimated, proportionate share of the total cost of the utilities:

Pursuant to § 16-262e (c), a property owner or landlord of a multiunit dwelling is "liable" for the utility costs, but a tenant may be liable for the utility cost when he or she is serviced on an individually metered or billed basis for his or her exclusive use of the utility.

Because the language of the statute and the dictionary definitions of "liable" did not specify to whom a tenant would have to be liable, the utility company or the landlord, to violate the statute, and because § 16-262e (c) does expressly allow, under certain circumstances, for the allocation of estimated costs for units without individual meters, this court concluded that § 16-262e (c) was ambiguous with respect to that issue.

Accordingly, this court looked to the legislative history of that provision, which demonstrated that the provision was promulgated to provide consumer protections to tenants in multiunit residential buildings with a master meter, and, because this court was required to interpret the statutory provision broadly to achieve its remedial purpose, it construed "liable" to mean that the tenant may not be held liable to anyone for the cost of a utility that he or she has not exclusively used.

Moreover, states that have legislation that explicitly authorizes the use of RUB also have statutes that provide numerous protections for tenants, whereas Connecticut, in contrast, lacks any such explicit provisions permitting the use of RUB or defining the protections for tenants in such situations.

In the present case, under the RUB methodology, a tenant's monthly utility bill represents the tenant's estimated, proportionate share of the total utility consumption, which N Co. would calculate based on factors that it would select in its sole discretion, and, therefore, N Co.'s use of the RUB methodology would violate § 16-262e (c) insofar as it would render a tenant liable to N Co. for the costs of utilities that were not individually metered or that the tenant did not exclusively use.

Furthermore, N Co. could not prevail on its claim that, if § 16-262e (c) prohibits landlords from utilizing the RUB methodology, then it also must prohibit the "building in" approach deemed acceptable by PURA, as the "building in" approach, which allows a landlord whose multiunit building operates with a master meter to build the estimated, annual utility costs into the monthly rent for each unit, is entirely consistent

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

with standard practices regarding the setting of rent and is governed by title 47a of the General Statutes, which does not prohibit such a practice.

In addition, the "building in" approach also is more consistent with the remedial statutory scheme than the RUB method, as it allows for tenants to have consistent and predictable payments each month and places the risk that the tenants may use more utilities than anticipated each month on the landlord.

(*Three justices dissenting in one opinion*)

Argued October 18, 2023—officially released May 7, 2024

*Procedural History*

Appeal from the supplemental decision of the defendant finding that the plaintiff's use of ratio utility billing was not authorized by law, brought to the Superior Court in the judicial district of New Britain, where the court, *Cordani, J.*, granted the motion to intervene filed by the Office of Consumer Counsel; thereafter, the case was tried to the court, *Henry S. Cohn*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment dismissing the plaintiff's appeal, from which the plaintiff appealed. *Affirmed.*

*David A. Ball*, with whom was *David E. Dobin*, for the appellant (plaintiff).

*Robert L. Marconi*, assistant attorney general, with whom, on the brief, was *William Tong*, attorney general, for the appellee (defendant).

*William E. Dornbos*, legal director, with whom, on the brief, were *Thomas H. Wiehl*, director of utility oversight and regulatory reform, and *Andrew W. Mini-kowski*, staff attorney, for the appellee (intervenor Office of Consumer Counsel).

*Opinion*

McDONALD, J. This case resolves the question of whether a landlord of a multiunit residential building may recoup from its tenants the costs for utility services that it is liable to pay to a utility provider when the

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

building does not have individual meters for each unit but, rather, has only a master meter. The plaintiff, Northland Investment Corporation, manages and owns multiunit residential buildings throughout the United States, including Connecticut. In its buildings that have only a master meter for the entire building, the plaintiff employs, or seeks to employ, a recoupment method it refers to as "ratio utility billing" (RUB). Under the RUB method, as developed by the plaintiff, it pays the utility company directly for the building's entire utility bill and then recoups the cost from the tenants in the form of a variable utility payment each month. Under this form of billing, the plaintiff bills each tenant directly for what the plaintiff contends is the tenant's "proportionate share" of utilities based on factors it has chosen (which it can modify in its sole discretion), such as a unit's square footage, number of occupants, number of bedrooms and bathrooms, or a combination of these. This method of utility billing is included in a provision of the plaintiff's lease agreements.

The plaintiff sought a declaratory ruling from the defendant, the Public Utilities Regulatory Authority (PURA), that it may use RUB in recouping its costs for utility services from tenants. PURA concluded that the plaintiff was not authorized to do so. In the administrative appeal that followed, the trial court upheld PURA's decision. Both of the parties rely on General Statutes § 16-262e (c) in support of their respective arguments. Section 16-262e (c) governs the liability for payment of utility services provided to residential dwellings. The plaintiff argues that the plain meaning of § 16-262e (c) does not expressly prohibit the use of RUB. Because RUB is not expressly prohibited by law, the plaintiff argues, the method qualifies as a payment of "rent" under General Statutes (Supp. 2024) § 47a-1 (h). PURA disagrees and instead argues that RUB violates the plain meaning of § 16-262e (c) because the provision allows

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

a tenant to be liable for utility costs only if the tenant's unit is individually metered and he or she has exclusively used the utilities so provided.[1] We agree with PURA and conclude that § 16-262e (c) precludes a landlord's use of RUB to recoup utility service charges from tenants.

We begin with an overview of this state's statutory scheme governing utility billing and its relationship to landlord-tenant law. Historically, landlords in Connecticut who owned multiunit residential buildings with a master meter would estimate the cost they would likely incur for utilities that year and build that figure into each unit's monthly rent.[2] See, e.g., Conn. Joint Standing Committee Hearings, Energy and Public Utilities, Pt. 1, 1984 Sess., p. 387, remarks of Attorney Raphael Podolsky. Problems arose, however, when landlords attempted to shift the responsibility for paying the building's utility bill to their tenants. For example, a landlord could insist that one tenant in a multiunit building pay the cost for the entire building's utility bill and then collect payments from the other tenants. See id., p. 384, remarks of Attorney Edward Dale. In 1984, in an effort to provide consumer protections for tenants against these practices, the General Assembly passed No. 84-321 of the 1984 Public Acts (P.A. 84-321), titled "An Act Concerning Residential Utility and Heating Fuel Accounts" (act), which was codified at General Statutes (Rev. to 1985)

_____

[1] The Office of Consumer Counsel (OCC) is an intervenor in this matter and, as such, filed a brief in this appeal. The OCC is an independent government agency, within the Department of Energy and Environmental Protection, designated by statute as the advocate for all consumers of the state's regulated electric, natural gas, water, and telecommunications utilities, as well as the customers of electric suppliers. See General Statutes § 16-2a (a). Section 16-2a (a) authorizes the OCC "to appear in and participate in any regulatory or judicial proceedings, federal or state, in which such interests of Connecticut consumers may be involved . . . ." The arguments made by the OCC largely track those of PURA.

[2] General Statutes (Supp. 2024) § 47a-1 (h) defines "rent" as "all periodic payments to be made to the landlord under the rental agreement."

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

§ 16-262e (c). The purpose of the act was to ensure that, in instances in which a multiunit residential building has only one master meter rather than individual meters or submeters for each unit, the landlord would be liable for the utility bill. See 27 H.R. Proc., Pt. 9, 1984 Sess., p. 3274, remarks of Representative David Lavine (stating that bill "clarifies" that "it is [the] property owner's duty to provide heat and utility service for an apartment unless that unit can be individually metered").

The plaintiff in this case owns two multiunit residential buildings in the state.[3] These properties receive gas, electric, steam, chilled water, and water and sewer services from public service utility companies. The plaintiff sought to use RUB to bill tenants for the utilities it provides that are not otherwise individually metered.[4] Under the RUB method, when there is a master meter, the plaintiff is billed directly by the utility company for all of its tenants' utility usage. When the plaintiff receives the utility bill each month, it then separates the monthly charges and bills its tenants based on what the plaintiff has determined as their "proportionate share of the collective consumption . . . captured by the master meter . . . ." Each tenant's share is calculated based on factors that are chosen by the plaintiff, such as a unit's square footage, the number of occupants in the unit, and the number of bedrooms and bathrooms. At oral argument, the plaintiff's attorney affirmatively stated that RUB would not be used to recoup utility costs for common areas, such as hallways, garages or elevators, but the plaintiff's sample lease outlining the plaintiff's RUB calculation framework specifically permits it: "Under any allocation method, [the tenant] may be paying for part of the utility usage in common areas or in

---

[3] The first is located at 221 Trumbull Street in Hartford, and the second is located at 55 Main Street in Enfield.

[4] Specifically, the plaintiff seeks to use RUB to calculate the bills for tenants for gas, water, and sewer services.

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

other residential units as well as administrative fees.'' The administrative fees that could be charged to the tenants by the plaintiff are not defined or limited in the sample lease. The sample lease also makes clear that this ''allocation method may or may not accurately reflect actual total utility consumption . . . .'' Furthermore, the sample lease provides that the plaintiff may amend the methodology for calculating a tenant's ''allocated share of utilities and services and all other billing methods, in [its] sole discretion . . . .'' Finally, the sample lease states that, should the tenant fail to pay the tenant's allocated share of the plaintiff's utility bill, as determined in the sole discretion of the plaintiff, within seven days of the date of issue, the tenant will be subject to a late fee, and specifies that a late payment or failure to pay the utility bill is a ''material and substantial breach of the [l]ease'' for which the plaintiff may ''exercise all remedies available . . . up to and including eviction . . . .''

The plaintiff filed a petition for a declaratory ruling with PURA, seeking a declaration that § 16-262e (c) would not prohibit the plaintiff from using RUB to charge its tenants for utility costs the plaintiff is liable to pay. In its final decision, PURA concluded that RUB violates the plain meaning of § 16-262e (c) because that provision ''expressly prohibits charging a tenant for utility services [the tenant] did not exclusively use.'' PURA explained that, although the plaintiff cannot use RUB to bill tenants for their utility usage, in accordance with § 16-262e (c) and historical metering practices, it could build the estimated cost of utilities into the fixed rent charged to tenants each month (''building in'' approach) as provided in their leases, thereby resulting in a consistent monthly payment. In other words, PURA concluded that billing tenants for utilities on the back end (i.e., each month after the bill is paid by the plaintiff) is prohibited but that forecasting in advance what a unit's

yearly utility usage will be, and building that figure into the monthly rent at the time the lease is signed, does not violate the statute.

The plaintiff filed an administrative appeal from that decision. The trial court remanded the case to PURA for further consideration of whether PURA's decision that RUB violates § 16-262e (c) conflicts with its conclusion that the "building in" approach does not similarly violate the statute. PURA issued a supplemental decision in which it reaffirmed that the "building in" approach does not violate § 16-262e (c) and explained that such an approach is "nothing more than the ordinary process by which a landlord calculates and charges rent" rather than provide a direct bill for utilities. The plaintiff appealed from PURA's supplemental decision to the trial court, which dismissed the appeal and rendered judgment thereon. The plaintiff then appealed from the trial court's judgment to the Appellate Court, and we transferred the appeal to this court.

On appeal, the plaintiff contends that the trial court erred in upholding PURA's determination that § 16-262e (c) prohibits the plaintiff's proposed use of RUB to recoup building wide utility costs by billing tenants for their estimated proportionate share of the total cost.

Judicial review of an administrative agency's determinations is governed by the Uniform Administrative Procedure Act and is ordinarily restricted in scope, with the court's "ultimate duty" being to decide, "in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Murphy* v. *Commissioner of Motor Vehicles*, 254 Conn. 333, 343, 757 A.2d 561 (2000). "Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . We have determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . .'' (Internal quotation marks omitted.) *1st Alliance Lending, LLC* v. *Dept. of Banking*, 342 Conn. 273, 280, 269 A.3d 764 (2022). Whether § 16-262e (c) prohibits the plaintiff's use of RUB is a question of statutory interpretation over which our review is plenary. See, e.g., *LaFrance* v. *Lodmell*, 322 Conn. 828, 833–34, 144 A.3d 373 (2016).

Review of § 16-262e (c) and the relevant statutory scheme must be in accordance with General Statutes § 1-2z and the familiar principles of statutory construction. See, e.g., *Sena* v. *American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 45–46, 213 A.3d 1110 (2019). The meaning of § 16-262e (c) must, in the first instance, "be ascertained from the text of the statute itself and its relationship to other statutes." General Statutes § 1-2z.

The plaintiff concedes the remedial nature of the consumer protections contained in § 16-262e. Notwithstanding that concession, the plaintiff contends that PURA's interpretation of § 16-262e (c)—which prohibits landlords from using RUB—violates the plain meaning of the statute. Specifically, the plaintiff contends that, because § 16-262e (c) does not expressly prohibit landlords from recouping their utility costs from tenants, RUB is permitted. For its part, PURA argues that RUB violates the plain meaning of § 16-262e (c) because it holds a tenant ultimately liable for the payment of utilities not exclusively used by the tenant. It reasons that, under the RUB method, even though the utility bill is initially in the plaintiff's name, the tenant is ultimately responsible for, and liable to, the plaintiff for the pay-

ment of the share of the bill that the plaintiff has assigned to the tenant under the RUB formula. PURA effectively argues that the plaintiff cannot accomplish indirectly that which it is precluded from doing directly.

We begin with the text of the statute. Section 16-262e (c) provides in relevant part that "[t]he owner, agent, lessor or manager of a residential dwelling shall be liable for the costs of all electricity, gas, water or heating fuel furnished by a public service company, electric supplier, municipal utility or heating fuel dealer to the building, except for any service furnished to any dwelling unit of the building on an individually metered or billed basis for the exclusive use of the occupants of that dwelling unit . . . ." In short, § 16-262e (c) sets out the general rule that a property owner of a multiunit dwelling is "liable" for the utility costs and then provides an exception to this rule: when a tenant is serviced on an individually metered or billed basis for his or her exclusive use of the utility, then that tenant may be liable for the utility cost. Accordingly, whether RUB is permitted under § 16-262e (c) turns on the meaning of the term "liable."

Because there is no statutory definition of the term "liable," we begin with the dictionary definitions of the term. See, e.g., *Seramonte Associates, LLC* v. *Hamden,* 345 Conn. 76, 84, 282 A.3d 1253 (2022). Ballentine's Law Dictionary defines "liable" as "[u]nder liability or legal responsibility." Ballentine's Law Dictionary (3rd Ed. 1969) p. 732. It defines "liability" as "[t]he condition of being bound in law and justice to pay an indebtedness or discharge some obligation." Id. Significantly, the definition of "liability" goes on to state that "liability" is a "word of different meanings, the pertinent one to be gathered from the context in which it appears, construed in the light of surrounding circumstances." Id.; see also, e.g., S. Gifis, Law Dictionary (2d Ed. 1984) p. 270 (defining "liable" as "to be responsible for" or "to

be obligated in law''); The American Heritage College Dictionary (4th Ed. 2007) p. 797 (defining "liable" as "[l]egally obligated" or "responsible"). Section 16-262e (c) does not specify to whom the liability is directed, the utility company or the landlord. If § 16-262e (c) specified that it governed only liability to the utility company, we would have to agree with the plaintiff's contention that RUB does not violate the statute because RUB does not make the tenant liable to the utility company for payment of the utility bill. If, on the other hand, § 16-262e (c) specified that it precluded a tenant from being liable in any respect for utility payments other than those due as a result of the tenant's exclusive use of the utility on an individually metered basis, we would have to agree with PURA's determination that RUB violates the statute. Because the language of the statute and the dictionary definitions of "liable" do *not* specify to whom a tenant would have to be liable to violate the statute, we conclude that § 16-262e (c) is ambiguous in this respect. See, e.g., *State* v. *Josephs*, 328 Conn. 21, 26, 176 A.3d 542 (2018) (stating that "[a] statute is ambiguous if, when read in context, [it] is susceptible to more than one reasonable interpretation" (internal quotation marks omitted)).

The relevant statutory language is ambiguous for an additional reason. The plain language of the statute does envision a circumstance in which utility costs are borne or shared by tenants even when there is no individual metering, namely, when the landlord "fails to pay for such service, [in which case] any occupant who receives service in his own name may deduct, in accordance with the provisions of subsection (d) of this section, a reasonable estimate of the cost of any portion of such service which is for the use of occupants of dwelling units other than such occupant's dwelling unit." General Statutes § 16-262e (c). This provision thus does expressly allow, under certain specified cir-

46 MAY, 2024 349 Conn. 35

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

cumstances, for the allocation of estimated costs in units without individual meters. However, this provision does not provide that it is the only situation in which the legislature envisioned the use of estimated costs. But cf. *Commission on Human Rights & Opportunities* v. *Edge Fitness, LLC*, 342 Conn. 25, 36–37, 268 A.3d 630 (2022) (inclusion of statutory exception addressing one situation indicates that legislature could have added additional exception to antidiscrimination statute had it desired to do so).

Given this ambiguity, we therefore "look for interpretive guidance to the legislative history and circumstances surrounding [the statute's] enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and [common-law] principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Hernandez* v. *Apple Auto Wholesalers of Waterbury, LLC*, 338 Conn. 803, 815, 259 A.3d 1157 (2021).

The legislative history reveals that § 16-262e was intended to provide consumer protections for tenants and is remedial in two respects. First, it clarifies that only a landlord is liable for utility bills if the building has a master meter. See 27 H.R. Proc., supra, p. 3274, remarks of Representative Lavine; see also Conn. Joint Standing Committee Hearings, supra, pp. 382–83, remarks of Attorney Dale ("tenants are unfairly saddled with utility bills for service[s] that they do not actually use in their own apartments"); Conn. Joint Standing Committee Hearings, supra, p. 383 ("someone should only be responsible in terms of the utility bill . . . for the service that they're actually receiving"). Second, it provides a remedy for tenants that did not previously exist by allowing tenants, in an instance in which the landlord has failed to pay a utility bill from a master meter, to accept service in their own names for the utility bill and then to deduct from the rent the amount

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

that they reasonably estimate not to be attributable to their own exclusive use. See General Statutes § 16-262e (c) and (d). As we noted, the plaintiff concedes that the act is remedial in nature and was promulgated to "absolutely [protect] tenants."

As we discussed, the General Assembly added subsection (c) to § 16-262e in 1984 when it enacted P.A. 84-321. Subsection (a) of § 16-262e works in tandem with subsection (c) by providing that a utility company may not terminate utility service to a multiunit residential dwelling if it is not occupied exclusively by the owner unless the utility company (1) "makes a good faith effort to notify the occupants," and (2) provides an opportunity, when practicable, for occupants to receive service in their own names. Speaking in support of the amendment on the House floor, Representative Lavine stated that the act "makes it clear that it is [the] property owner's duty to provide heat and utility service for an apartment *unless that unit can be individually metered.* It's important that this be clarified because there have been a number of instances [in which] tenants have found themselves responsible for collecting or trying to collect utility payments which they have been forced to make for other apartments in the building. This would make it crystal clear that if that occurs, the tenant can deduct a reasonable amount from his rent in order to get equity." (Emphasis added.) 27 H.R. Proc., supra, pp. 3274–75. Section 16-262e (a) also provides that, in a circumstance in which it is not practicable for tenants to receive service in their own names, the utility company may not terminate service but may pursue the remedy provided in General Statutes §§ 16-262f and 16-262t, which allows the utility company to petition the trial court to appoint a receiver, who will collect the utility payments from tenants. Subsections (a) and (c) of § 16-262e, then, ensure that tenants are not liable for the costs of utilities they have not exclusively used and

that utilities serving multiunit residential dwellings are not shut off because of the failure of a landlord to pay. This contrasts with the circumstances of a typical, single unit dwelling where the owner resides at the property, and the utility company can, after providing notice, and subject to certain other requirements and exceptions, shut off the utility. See General Statutes § 16-262d. In sum, the legislative history strongly supports the conclusion that, "if you can individually provide the service to an apartment, then the tenant can be made responsible for paying for it. . . . If, for whatever reason, the building is so constructed, or the metering system is so arranged, you can't divide that, then that becomes a landlord responsibility." Conn. Joint Standing Committee Hearings, supra, p. 387, remarks of Attorney Podolsky.

It is a well established principle of statutory interpretation that "remedial statutes should be construed liberally in favor of those whom the law is intended to protect . . . ." (Internal quotation marks omitted.) *Hernandez* v. *Apple Auto Wholesalers of Waterbury, LLC*, supra, 338 Conn. 815. The legislative history surrounding § 16-262e (c) makes clear that the provision's purpose is to provide consumer protections to tenants in multiunit residential buildings with a master meter. Accordingly, because we must construe the statute broadly to achieve its remedial purpose, we must construe "liable" to mean that the tenant may not be held liable *to anyone* for the cost of a utility that he or she has not exclusively used. RUB impermissibly makes the tenant liable to the landlord for the utility payments because the tenant is responsible for, and bound to make, the payment charged to him or her each month pursuant to the lease agreement. Should the tenant fail to remit such payment, he or she is subject to a late fee and risks eviction. Indeed, the sample lease provided by the plaintiff explicitly states that a late payment or

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

failure to pay a utility bill is a "material and substantial breach of the [l]ease" for which the landlord may evict the tenant. Furthermore, this court has established that, in cases such as this, in which the court must construe a remedial statute, it "should not read into [the] remedial statute an unstated exception that would undermine the legislature's manifest intent . . . ." *Commission on Human Rights & Opportunities* v. *Sullivan Associates*, 250 Conn. 763, 781–82, 739 A.2d 238 (1999). Allowing a landlord to mandate that a tenant be liable for utility payments calculated using RUB would qualify as such an "unstated exception," contrary to the legislature's clear intent.

Finally, we note that several states have legislation that explicitly permits the use of RUB. See, e.g., Minn. Stat. Ann. § 504B.215 (2a) (West 2023); Or. Rev. Stat. § 90.562 (1) (c) (2023). These states, however, have statutes that provide numerous protections for tenants. For example, Minnesota's statute requires landlords to provide tenants in "single-metered residential building[s]" that apportion utility costs with, upon request, copies of the total utility bills for the building and notice of the availability of energy assistance programs for low income individuals. Minn. Stat. Ann. § 504B.215 (2a) (a) (3) and (b) (West 2023). Similarly, Oregon's statute limits the landlord's right to use "pro rata" billing for garbage removal and provides that utility charges may not constitute "rent" under the lease agreement, while specifying circumstances under which a landlord may seek to evict for nonpayment of utility charges. Or. Rev. Stat. § 90.562 (2) and (4) (2023). Connecticut lacks any such explicit provisions permitting the use of RUB or defining the protections for consumers in such situations. Should the legislature decide to evaluate all the possible ramifications of permitting RUB, it is, of course, free to do so.

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

Applying this construction to the utility services in the present case, we conclude that RUB does not satisfy the exception to the general rule that the property owner is "liable" for the cost of the utility service because the payments made under the RUB method are not for utility service that the tenant exclusively used. As the plaintiff's sample lease expressly provides, the amounts charged to a tenant under the RUB method "may or may not accurately reflect actual total utility consumption" by the tenant. Rather, RUB uses an estimate based on factors selected in the sole discretion of, and subject to unilateral amendment by, the plaintiff. The use of RUB by landlords in this context therefore violates § 16-262e (c) by making the tenant liable to the landlord for the costs of utilities that were not individually metered or that the tenant did not exclusively use.

The plaintiff nevertheless argues that, if § 16-262e (c) prohibits landlords from utilizing RUB, then it must also prohibit the "building in" approach deemed acceptable by PURA. We disagree. The "building in" approach is plainly not equivalent to RUB. Under the "building in" approach, landlords whose buildings operate with master meters estimate the cost they will incur for utilities that year and build that figure into the monthly rent. Such a practice is entirely consistent with standard practices regarding the setting of rent. Although not enumerated, the cost of rent often reflects not only a profit to a landlord, but also the costs associated with property ownership, such as mortgages, maintenance costs, capital repairs, real and personal property taxes, insurance, etc. Such costs, including estimated yearly utility costs, appropriately fall under the definition of "rent" under General Statutes (Supp. 2024) § 47a-1 (h) because they are included in the periodic payments made to the landlord under the rental agreement. As such, the "building in" approach is governed by title

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

47a of the General Statutes, and nothing in title 47a prohibits such a practice. RUB, on the other hand, which allows for a separate and variable bill to be sent to the tenant each month, is a *utility bill* that is governed by title 16 of the General Statutes. Title 16, and more specifically § 16-262e (c), *does* prohibit RUB because § 16-262e (c) does not allow for a tenant to be made liable for the payment of utilities other than for those which the tenant exclusively used. Notably, the "building in" approach allows for tenants to have consistent and predictable payments each month and places the risk that the tenants may use more utilities than anticipated each month on the landlord. This is a preferable system in this remedial statutory scheme because, under the RUB method, the tenant has no control over the utility usage of other units within the building and could be forced to subsidize a large utility bill despite the tenant's own best efforts to keep costs to a minimum.[5]

## CONCLUSION

We conclude that § 16-262e (c) prohibits the plaintiff's proposed use of a RUB system to recoup its building wide utility costs by billing tenants for their estimated share of the total cost.

---

[5] The dissent takes issue with our determination that the "building in" approach is acceptable whereas RUB is not. See part II of the dissenting opinion. The dissent points out that the "building in" approach results in tenants effectively subsidizing the utility consumption of the other tenants in the building, which is an issue with RUB as well. See id. The key difference, however, as stated in this opinion, is that, under the "building in" approach, tenants have a consistent and predictable monthly payment. If a landlord underestimates the cost of utilities in a given year, it is the landlord who must absorb the cost. Under the RUB method, however, not only do the tenants subsidize the utility consumption of their neighbors, but they have absolutely no control over, and cannot predict, the amount that is due each month to cover the utilities of the building. It is these two factors that exist under the RUB method that, combined, make the system unreasonable in the absence of legislation that authorizes, and places parameters around the use of, RUB.

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

The judgment is affirmed.

In this opinion D'AURIA, ALEXANDER and DAN-NEHY, Js., concurred.


ECKER, J., with whom ROBINSON, C. J., and MUL-LINS, J., join, dissenting. As a matter of good govern-ment, I have no quarrel with the majority's conclusion that the result it reaches today advances a legitimate and even praiseworthy public policy. If a residential landlord who pays the utility bill for a multiunit apart-ment building desires to recoup those expenses from its tenants,[1] I may agree that enlightened public policy should require the landlord to do so by imposing "con-sistent and predictable payments [on each tenant] each month" rather than charging the tenants variable monthly amounts that will increase when other tenants "use more utilities than anticipated each month . . . ." After all, a tenant in one unit has no control over the use of utilities by other tenants in other units, and it seems sensible to me that tenants with parsimonious habits in this respect should not suffer financial uncer-tainty each month due to the unpredictable behavior of other tenants who may have more extravagant usage habits. But we are construing a statute, not enacting one. The most basic principles of statutory construction prohibit us from substituting our own policy prefer-ences, however commendable, for the policy choices made by the legislature. The public policy that the majority identifies as dispositive in this case is nowhere to be found in the statute under construction, General Statutes § 16-262e (c).

[1] For the sake of simplicity, I use the words "landlord" and "tenant" throughout this opinion to refer to the relevant actors. The actual terms in General Statutes § 16-262e are "owner, agent, lessor or manager" and "occupant," respectively. The words I use are not perfectly synonymous with the statutory terms, but any technical differences have no relevance to the present case.

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

The manifest legislative objective of § 16-262e, reflected in every one of its provisions, is to protect tenants by preventing utility companies from shutting off service to a residential building when the landlord fails to pay a utility bill for which it is liable. *Nothing* in the statute contains any suggestion, express or implied, that the legislature intended either to prohibit a landlord from recovering its utility expenses from its tenants or, alternatively, to regulate the recoupment methodology used by the landlord to recover those expenses. The statute, in short, is aimed at solving the problems that arise when landlords do not pay their utility bills; it has nothing to say about the issues that may arise when landlords fulfill their obligations to pay those bills, which is the scenario involved in the present case.

As will become apparent, the plain language of § 16-262e, the structure of the statute, and its relationship to other statutes all lead to the conclusion that § 16-262e does not regulate the means by which a landlord may recoup its utility costs from its tenants. Indeed, even the majority acknowledges, as it must, that a landlord's recoupment of utility costs from the tenant is proper under the statute. What the majority fails to acknowledge is that the line it draws between permissible and impermissible methods of recoupment is nowhere to be found in the statute or the public policy animating its enactment. The public policy that the majority reads into the statute may be a good one, but it is not our role to promulgate that policy. I respectfully dissent.

I

I agree with the majority that the proper construction of § 16-262e is a question of law over which our review is plenary. Analysis of the statute must begin with its language and relationship to other statutes. See General Statutes § 1-2z.

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

The majority focuses its attention on the language in § 16-262e (c) providing that a landlord "shall be liable" for the costs of utilities, "except for any service furnished to any dwelling unit of the building on an individually metered or billed basis for the exclusive use of the occupants of that dwelling unit . . . ." The majority seems to find this language to be ambiguous because it is unclear whether the landlord's statutory liability prohibits the landlord from recouping its utility costs from tenants utilizing the "ratio utility billing" (RUB) method, whereby the landlord pays the utility service provider directly and thereafter bills its tenants individually for their estimated proportionate share of the total payment under the terms of the rental agreement. In light of this perceived ambiguity, the majority deems it necessary to consult the legislative history and public policy underlying the statute. Using as its springboard the premise that § 16-262e is a remedial statute that must be construed broadly, the majority concludes that a landlord may not recover its utility expenses from its tenants under RUB because, in the majority's words, the statute prohibits tenants from being "held liable *to anyone* for the cost of a utility that he or she has not exclusively used." (Emphasis in original.)

The majority's broad construction of § 16-262e (c) is inconsistent with the plain and unambiguous language of the statute, the larger statutory scheme established by the legislature in § 16-262e, and the relevant provisions of title 47a of the General Statutes governing landlord-tenant relations. It also is internally inconsistent with the majority's own conclusion that a landlord is not prohibited from recovering its utility expenses from a tenant using the so-called "building in" method of cost recovery.[2] The reality is that, so long as the

---

[2] "Building in" is a recoupment method under which the landlord estimates monthly utility costs in advance and then, without separately itemizing or identifying those costs, incorporates them into the total amount of rent due under the terms of the rental agreement.

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

landlord pays its utility bills, nothing in our statutes prevents the landlord from recovering those utility costs from its tenants under the terms of a rental agreement, regardless of whether the charges are calculated using the RUB method, the "building in" method, or some other method of recoupment that is not prohibited by law.

Section 16-262e contains eight subsections, (a) through (h), and, before more closely examining the text of subsection (c), the central provision at issue, it is useful to review the whole statute to better understand its manifest purpose and scope. Subsection (a) sets forth the most fundamental prohibition in the statute, which provides that the utility company "shall not terminate [utility] service for nonpayment of a delinquent account owed to such company" by the landlord. General Statutes § 16-262e (a). This provision applies to the termination of services for any "residential dwelling" in a building not occupied exclusively by its owner when the utility company "has actual or constructive knowledge that the occupants of such dwelling are not the individuals to whom the [utility] company . . . usually sends its bills . . . ." General Statutes § 16-262e (a). In other words, if the utility bill is sent to the landlord, service to the tenants may not be terminated as a result of the landlord's failure to pay the bill.

Subsection (a) contains a single exception, which permits termination of such services when the utility company "(1) . . . makes a good faith effort to notify the occupants of such building of the proposed termination by the means most practicable under the circumstances and best designed to provide actual notice; and (2) . . . provides an opportunity, where practicable, for such occupants to receive service in their own names without any liability for the amount due while service was billed directly to the lessor, owner, agent or manager and without the necessity for a security

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

deposit; provided, if it is not practicable for such occupants to receive service in their own names, the [utility] company . . . shall not terminate service to such residential dwelling but may pursue the remedy provided in sections 16-262f and 16-262t.''[3] General Statutes § 16-262e (a). Upon due notice, service to the building may be terminated if the tenants are given an opportunity to receive service in their own names and it is practicable to provide service by that method.

The remainder of the statute fills in the details. Subsection (b) specifies that, if service was erroneously terminated under subsection (a) because of a mistaken understanding about who gets billed, the utility company must reinstate service upon learning that the tenants "are not the individuals to whom it usually sends its bills . . . .'' General Statutes § 16-262e (b). Subsection (c), which I will discuss in more detail in part II of this opinion, provides the way to determine whether the landlord or tenant is liable to the utility company for payment—the landlord is responsible for such payment, unless the utility "service [is] furnished to any dwelling unit of the building on an individually metered or billed basis for the exclusive use of the occupants of that dwelling unit . . . .'' General Statutes § 16-262e (c). Subsection (c) also provides that, if the landlord "fails to pay'' for utilities when it is required to do so, the tenants may arrange to receive service in their own names and "may deduct, in accordance with the provisions of subsection (d) of this section, a reasonable estimate of the cost of any portion of such service which

---

[3] General Statutes § 16-262f (a) (1) permits the utility company to "petition the Superior Court or a judge thereof, for appointment of a receiver of the rents or payments for use and occupancy or common expenses . . . for any dwelling for which the owner, agent, lessor or manager is in default.'' Accord General Statutes § 16-262t (a) (1) (water companies). The utility company can recover its expenses, any arrearages, and reasonable fees and costs from the money held by the receiver. See General Statutes § 16-262f (a) (4); see also General Statutes § 12-262t (a) (5).

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

is for the use of occupants of dwelling units other than such occupant's dwelling unit.'' General Statutes § 16-262e (c).

Subsection (d) provides that payments made by a tenant to the utility company pursuant to subsection (a) or (c) of the statute (i.e., payments made by the tenant to the utility company for services that are the landlord's obligation to pay) may be deducted by the tenant "from any sum of rent or payment for use and occupancy due and owing or to become due and owing to the" landlord. General Statutes § 16-262e (d). Subsection (e) requires the utility company to provide notice to each tenant of their right to deduct from rent the amount of any utility payments made by the tenant to a utility company in the event that a landlord's failure to pay its utility bills requires a tenant to arrange for service in their own name pursuant to subsection (a). See General Statutes § 16-262e (e). Subsection (f) prohibits a landlord from increasing rent "in order to collect all or part of that amount lawfully deducted by the occupant pursuant to this section." General Statutes § 16-262e (f). Subsection (g) requires a landlord to provide utility companies access to meters located on the premises. See General Statutes § 16-262e (g). Finally, subsection (h) provides that nothing in the statute "shall be construed to prevent" a utility company or tenant "from pursuing any other action or remedy at law or equity that it may have against the" landlord. General Statutes § 16-262e (h).

It is obvious that § 16-262e has nothing to say about a landlord's ability to recover its duly paid utility costs from its tenants. The statute is concerned with landlords who do *not* pay their utility bills, not with landlords who *do* pay their utility bills and thereafter seek to recoup those expenses from the tenants who receive the utility service. It is for this reason that the statute is focused on two things: (1) the landlord's obligation

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

to pay the utility company, and (2) the utility company's affirmative obligation to facilitate the tenants' efforts to avoid termination of services resulting from the landlord's nonpayment. The statute thus requires landlords to pay the utility bills (unless separately metered or billed) and imposes consequences if it fails to do so.[4] The obligations of the utility company are also central to the statutory scheme—the utility company is prohibited from terminating utility services for nonpayment except as specified, and it is required in various ways to accommodate the needs of tenants whose landlords fail to pay their utility bills. By contrast, the statute refers not

---

[4] Section 16-262e (c) permits tenants to engage in self-help by arranging to receive utility service in their own names and deducting the estimated amount of other tenants' utility expenses from the rental payments owed to the landlord. This is an exceptional remedy because landlords and tenants alike generally are forbidden from engaging in self-help in the event of an alleged breach of a duty owed by one to the other. See, e.g., General Statutes §§ 47a-12, 47a-14h, 47a-15, 47a-15a and 47a-43. In particular, a tenant normally may not unilaterally decide to withhold rent, or any part thereof, on the basis of an allegation that the landlord has failed to perform legal duties owed to the tenant. See General Statutes § 47a-14h (a) and (h). Thus, a tenant who claims a right to rent abatement based on substandard dwelling conditions generally is limited to the remedies available in § 47a-14h, which requires the aggrieved tenant to institute an action in the Superior Court and to pay the full amount of rent with the clerk of the court while that action is pending. See General Statutes § 47a-14h (a) and (h). I am aware of only two exceptions in title 47a to the general prohibition against tenants engaging in self-help, one of which is similar to § 16-262e, in that it permits the tenant to procure essential services if the landlord breaches its obligation to do so and allows the tenant to deduct the cost of those services from the rent. See General Statutes § 47a-13 (a) (1) ("[i]f the landlord is required to supply heat, running water, hot water, electricity, gas or other essential service, and if the landlord fails to supply such essential service and the failure is not caused by conditions beyond the landlord's control, the tenant may give notice to the landlord specifying the breach and may elect to . . . procure reasonable amounts of heat, hot water, running water, electric, gas or other essential service during the period of the landlord's noncompliance and deduct the actual and reasonable cost of such service from the rent"). The other exception permits a tenant to cease making rental payments if the dwelling is "damaged or destroyed by fire or other casualty to an extent that enjoyment of the dwelling unit is substantially impaired" due to no fault of the tenant. General Statutes § 47a-14 (a).

349 Conn. 35 MAY, 2024 59

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

at all to the rights of a landlord to recover its utility costs when the landlord *does* pay its utility bills, which is the only issue presented in this case.

II

In light of the foregoing statutory framework, the meaning of subsection (c) could not be more clear. Subsection (c) provides that "[t]he owner, agent, lessor or manager of a residential dwelling *shall be liable* for the costs of all electricity, gas, water or heating fuel furnished by a public service company, electric supplier, municipal utility or heating fuel dealer to the building, except for any service furnished to any dwelling unit of the building on an individually metered or billed basis for the exclusive use of the occupants of that dwelling unit, provided an owner, agent, lessor or manager *shall be liable* for service provided on an individually metered or billed basis pursuant to subsection (g) of this section from ten days after the date of written request by the company, supplier, utility or dealer if the company, supplier, utility or dealer is denied access to its individual meters or other facilities located on the premises of the building. Such owner, agent, lessor or manager *shall only be liable* when such owner, agent, lessor or manager controls access to such individual meters to which access is denied. If service is not provided on an individually metered or billed basis and the owner, agent, lessor or manager *fails to pay* for such service, any occupant who receives service in his own name may deduct, in accordance with the provisions of subsection (d) of this section, a reasonable estimate of the cost of any portion of such service which is for the use of occupants of dwelling units other than such occupant's dwelling unit." (Emphasis added.) General Statutes § 16-262e (c).

The meaning of this language is unmistakable. It provides that a landlord who does not individually meter

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

or bill utilities for a tenant's exclusive use "shall be liable" for the costs of the building's utility expenses. General Statutes § 16-262e (c). The meaning of the term "liable" in this context is plain and unambiguous: the landlord is legally responsible to pay for the cost of utility services provided to residential dwellings that are billed using a master meter. To whom is the landlord liable? The answer is equally clear: the landlord is liable to the utility company. In this regard, I perceive no ambiguity in the statute whatsoever. Logic dictates that the liability could not run to anyone else but the utility company because the service is provided by the utility company and the debt is owed to the utility company. The statute contains no suggestion of any other possibility. Indeed, as I previously discussed, the entire statute is directed to one end, which is to prevent the utility company from terminating service to tenants as a result of the landlord's failure to pay its bills. The risk of termination arises only when *the utility company* is not paid, and it therefore makes perfect sense that the liability at issue is the obligation to pay *the utility company.*

The majority contends that the term "liable" is ambiguous because § 16-262e (c) creates an exception to the landlord's liability when a tenant's utilities are serviced on an individually metered or billed basis, and the majority therefore finds it unclear whether the tenant's liability is owed to the utility company or the landlord. From this premise, the majority concludes that the statute is ambiguous "[b]ecause the language of the statute and the dictionary definitions of 'liable' do *not* specify to whom a tenant would have to be liable to violate the statute . . . ." (Emphasis in original.) I am unable to make sense of this argument. The fact that the tenant may be liable to the utility company under specified circumstances (i.e., when the unit is individually metered or billed) gives rise to no ambiguity about the

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

identity of the obligee, that is, the entity to whom the liability runs. Whether the liable party is the landlord or the tenant, the payment obligation referred to in § 16-262e (c) unequivocally is the obligation owed to the utility company. This point is obvious not only from the statutory text, but also upon examination of the statute as a whole, the manifest purpose of which is to ensure that the landlord's failure to pay the utility company does not result in the termination of service to the tenants.[5]

Nor can the majority import ambiguity from the fact that § 16-262e (c) permits a tenant, in the event a landlord fails to meet its utility payment obligations, to pay the utility company directly and then to deduct from rent "a reasonable estimate of the cost of any portion of such service which is for the use of occupants of dwelling units other than such occupant's dwelling unit." Nothing in this provision creates any ambiguity about what the statute means when it provides that the landlord "shall be liable" for utility costs billed on a master meter, or about whether the statute permits a landlord to recoup its duly paid utility costs from its tenants. The provision serves only to support the con-

[5] Indeed, careful examination reveals that not one word in the statute imposes liability on the tenant. Section 16-262e (c) provides that a landlord "shall be liable" and, in certain circumstances "shall only be liable," but it does not use the term "liable" in connection with tenants. No doubt, the tenant is liable for his or her own exclusive utility usage when that usage is individually metered or billed. But, unlike the provisions addressing the landlord's obligations, which expressly impose liability on the landlord, the statute does not expressly impose liability on the tenant. The reason it does not do so is that the statute is not concerned with the tenant's failure to meet his or her payment obligations; the tenant's nonpayment does not result in the evil addressed by the statute, which is termination of service to all tenants as a result of the landlord's failure to pay its liabilities. Subsection (h), which refers only to the right of recovery against the landlord, illustrates this point. See General Statutes § 16-262e (h) ("[n]othing in this section shall be construed to prevent the company, electric supplier, municipal utility, heating fuel dealer or occupant from pursuing any other action or remedy at law or equity that it may have against the" landlord).

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

clusion that the payor may recoup the costs spent on behalf of others who benefit from the utility service, which is precisely what landlords do when they recoup their utility costs using either the "building in" or RUB methodology.

There is additional evidence demonstrating that the statute is unambiguous as it relates to the ability of a landlord to recover its duly paid utility expenses from its tenants. Landlord-tenant relations are governed primarily by title 47a of the General Statutes, and it is unthinkable that the legislature would include in title 16 a provision prohibiting recoupment without simultaneously ensuring that such a provision is fully consistent with the bedrock terms of landlord-tenant law set forth in title 47a. See, e.g., *State* v. *Bemer*, 339 Conn. 528, 541, 262 A.3d 1 (2021) ("[t]he legislature is always presumed to have created a harmonious and consistent body of law . . . [so that] [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction" (internal quotation marks omitted)). General Statutes § 47a-3 provides that "[a] landlord and a tenant may include in a rental agreement terms and conditions not prohibited by law, including rent, term of the agreement and other provisions governing the rights and obligations of the parties." General Statutes (Supp. 2024) § 47a-4[6] then lists the terms that are prohibited in any rental agreement. Relevant to the present case is § 47a-4 (a) (10), which provides that "[a] rental agreement shall not provide that the tenant . . . agrees to pay a heat or utilities surcharge if heat or utilities is included in the rental agreement." The only plausible construction of this provision is that a landlord is permitted to include a provision in the rental agreement that operates to recover

[6] Hereinafter, all references to § 47a-4 are to the version of that statute in the 2024 supplement to the General Statutes.

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

its utility costs from its tenants, so long as the landlord does not add a surcharge. No one in the present case claims that the RUB recoupment method constitutes a surcharge under § 47a-4 (a) (10).

In fact, it is undisputed that utility costs can be included as a part of rent or charged as a separate item under the rental agreement. General Statutes (Supp. 2024) § 47a-1 (h) defines "[r]ent" as "all periodic payments to be made to the landlord under the rental agreement." Consistent with this definition, Connecticut law permits private parties to include in their rental agreement the tenant's obligation to pay the cost of utilities, as well as other costs incidental to the maintenance and ownership of the property. See *Presidential Village, LLC* v. *Perkins*, 332 Conn. 45, 59, 209 A.3d 616 (2019) (recognizing that private parties, unlike landlords receiving subsidies from federal Department of Housing and Urban Development, are "free to define 'rent' as they see fit"); *Elliott Enterprises, LLC* v. *Goodale*, 166 Conn. App. 461, 463–64, 142 A.3d 335 (2016) (defining rent to include "FIXED MINIMUM MONTHLY RENTAL . . . together with the TENANTS' pro-rata share of . . . UTILITIES" (emphasis omitted; footnote omitted; internal quotation marks omitted)).

Despite all of this, the majority concludes that periodic payments to the landlord under the rental agreement using the RUB methodology are utility payments prohibited by statute, rather than payments to cover the landlord's utility costs, because the monthly amounts are not "consistent and predictable" in advance. But nothing in Connecticut law imposes these requirements if the rental agreement provides otherwise. See General Statutes § 47a-3. Landlords and tenants are permitted to include in their rental agreement any terms and conditions on which they agree, so long as those terms and conditions are "not prohibited by law . . . ." General

Statutes § 47a-3. The RUB recoupment method is not prohibited by title 47a or § 16-262e. It is that simple.

It is also self-evident that RUB does not require a tenant to pay the costs attributable to other tenants' utility consumption any more than does the "building in" method deemed acceptable by the majority. To the contrary, the "building in" method likely results in less accurate cost calculations because it is based on historical data rather than actual current utility costs. Moreover, the "building in" approach provides landlords with an incentive to overestimate their monthly utility costs to safeguard against the possibility that they will be required to absorb the cost of unexpected increases in utility prices or usage. Although neither method allocates utility costs among tenants strictly on the basis of actual, exclusive usage per tenant, that is a feature common to both methods and plainly cannot be used to justify deeming one method lawful and the other legally prohibited.

For the foregoing reasons, it is clear to me that § 16-262e (c) plainly and unambiguously does not prohibit a landlord from recouping its utility costs via the RUB methodology. Although the statute "is remedial in nature and must be construed broadly to that end . . . [w]e are not free . . . to create ambiguity when none exists; in other words, we cannot accomplish a result that is contrary to the intent of the legislature as expressed in the [statute's] plain language." (Internal quotation marks omitted.) *Vincent* v. *New Haven*, 285 Conn. 778, 792, 941 A.2d 932 (2008); see also *State* v. *Orr*, 291 Conn. 642, 654, 969 A.2d 750 (2009) ("our case law is clear that ambiguity exists only if the statutory language at issue is susceptible to more than one plausible interpretation"). Stated another way, a reviewing court cannot "torture words to import ambiguity [when] the ordinary meaning leaves no room for ambiguity . . . ." (Internal quotation marks omitted.) *Honulik* v.

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

*Greenwich*, 293 Conn. 698, 710, 980 A.2d 880 (2009). The language of § 16-262e leaves no room for ambiguity, and the majority's expansive construction of the statute is unwarranted.

Finally, even if I were to conclude that the statute is ambiguous and therefore agree that it is proper to resort to extratextual evidence of legislative intent, I would arrive at the same result. The legislative history reflects that § 16-262e was intended to impose liability on the landlord for utility services delivered to a multiunit apartment building with a master meter and thereby prevent the utility company from terminating service due to the landlord's failure to timely pay the utility bill. It was contemplated that landlords paying such utility costs could and would recoup those costs from their tenants by charging higher or additional rent. For example, Attorney Raphael L. Podolsky of the Legal Services Training and Advocacy Project, one of the drafters of the bill, testified that, "[i]f, for whatever reason, the building is so constructed [so as to make individual metering impracticable], or the [master] metering system is so arranged, you can't [individually meter each unit], then that [utility service payment] becomes a landlord responsibility. *The landlord* [*builds*] *the costs to that into the rent, so for example . . . where there's a central furnace in a* [*multifamily*] *building, the landlord would pay for the heat, and he would obviously include heat in the rent. The rent is going to be higher in that kind of a building.*" (Emphasis added.) Conn. Joint Standing Committee Hearings, Energy and Public Utilities, Pt. 1, 1984 Sess., p. 387. Podolosky further explained that the statute "*does not in any way preclude a property owner from charging a tenant for heat or other utilities.*" (Emphasis added.) Id., 459. Thus, the legislature did not intend to bar landlords from recovering their utility costs by billing tenants for a reasonable estimate of their individual utility

Northland Investment Corp. *v.* Public Utilities Regulatory Authority

usage, regardless of whether that estimate is arrived at by using the RUB method, the "building in" method, or some other recoupment method.

I recognize that there may be sound public policy reasons to prohibit or limit a landlord's use of the RUB recoupment method. As the majority points out, RUB does not result in "consistent and predictable payments each month and places the risk that the tenants may use more utilities than anticipated each month" on a tenant who "has no control over the utility usage of other units within the building . . . ." However, it is up to the legislature, not the courts, to determine whether to bar the use of the RUB recoupment method or to impose statutory protections restricting its implementation. See, e.g., Ariz. Rev. Stat. Ann. §§ 33-1314.01 and 33-2107 (2021); Md. Code Ann., Real Prop. § 8-212.4 (c) and (d) (LexisNexis Supp. 2023); Minn. Stat. Ann. § 504B.215 (2a) (West 2023); N.M. Stat. Ann. § 47-8-20 (F) (Cum. Supp. 2015); Or. Rev. Stat. § 90.562 (2023); Va. Code Ann. § 55.1-1212 (D) (2022).[7] See generally *Jobe* v. *Commissioner of Correction*, 334 Conn. 636, 659, 224 A.3d 147 (2020) (observing that "the primary responsibility for formulating public policy must remain with the legislature" (internal quotation marks omitted)); *Doe* v. *Norwich Roman Catholic Diocesan Corp.*, 279 Conn. 207, 216, 901 A.2d 673 (2006) ("It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is a function of the legislature." (Internal quotation marks omitted.)).

For the foregoing reasons, I respectfully dissent.

---

[7] The majority notes that "several states have legislation that explicitly permits the use of RUB" and "provide numerous protections for tenants." It appears, however, that several states, such as California, Georgia, Indiana, Illinois, Nevada, Pennsylvania, and Washington, do not have statutes that expressly permit or limit the use of RUB, but landlords in those states employ the RUB methodology to recoup their utility costs from tenants. See National Conference of State Legislatures, Utility Submetering (last updated January 15, 2016), available at https://www.ncsl.org/energy/utility-submetering (last visited April 29, 2024); see also Synergy Utility Billing, Our Services: RUBS Billing, available at https://www.synergyutilitybilling.com/services/rubs-billing/ (last visited April 29, 2024).